UNITED STATES DISTRICT COURT JUDGE OETKEN
SOUTHERN DISTRICT OF NEW YORK

IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM,

Plaintiff,

v.

DELOITTE & TOUCHE LLP,

Defendant.

12 CV 2136

**COMPLAINT**
and
**JURY TRIAL DEMAND**



Plaintiff alleges:

## INTRODUCTION

1.      Plaintiff suffered millions of dollars of losses as a result a fraudulent investment scheme that had the elements of a classic Ponzi scheme. At all relevant times, Defendant served as the auditor of a company controlled by the operators of the fraudulent scheme, and it aided and abetted the scheme by issuing unqualified and/or "clean" audit reports on which Plaintiff justifiably relied in purchasing securities issued as part of the scheme. Defendant acted in willful blindness of the scheme, and its auditing practices were so deficient that the audits amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful, and the professional judgments which it made were such that no reasonable auditor would have made the same decisions if confronted with the same facts.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as it arises under the laws of the United States, to wit: the Securities Exchange Act of 1934 (the "Exchange Act"), and pursuant to 28 U.S.C § 1332, as there is complete diversity of

citizenship between Plaintiff and Defendant and the amount in controversy exceeds $75,000 exclusive of interest and costs.

3.      This Court has personal jurisdiction over the Defendant because it is doing business in this district and Plaintiff's claims arise from wrongful acts and omissions that occurred here.

4.      Venue is lodged in this Court pursuant to 28 U.S.C. § 1391 because Defendant resides here.

## PARTIES

5.      Plaintiff Iowa Public Employees' Retirement System ("IPERS") is a pension fund that serves public employees of the state of Iowa. It is a governmental entity with its principal place of business in Iowa.

6.      Defendant Deloitte & Touche LLP ("Deloitte") is a Delaware limited liability partnership with its principal place of business in New York.

## THE SCHEME

7.      The scheme was perpetrated by Paul Greenwood ("Greenwood"), Stephen Walsh ("Walsh"), and their co-conspirators, acting through companies they controlled, including WG Trading Company, Limited Partnership ("WGTC"), a registered broker-dealer, Westridge Capital Management, Inc. ("WCM"), a registered investment adviser, WG Trading Investors, L.P. ("WGTI"), an unregistered investment vehicle, and WGIA LLC ("WGIA") an entity created specifically to facilitate IPERS' investment ( the "Westridge Entities").

8.      Greenwood and Walsh conducted their fraudulent investment scheme from at least 1996 until early 2009, when federal regulators placed the Westridge Entities into receivership. During this time-period, they solicited a number of institutional investors, including educational institutions and public pension and retirement plans (including IPERS) by promising

to invest their money in an "enhanced equity index" strategy that involved two components: 1) purchasing and selling equity index futures and 2) engaging in equity index arbitrage trading. WGTC was the Westridge Entity that handled the equity index arbitrage trading component of the strategy. Generally, approximately 85% of an investor's investment was to be directed to the WGTC component of the strategy.

9.     Throughout the scheme, Greenwood and Walsh offered investors three different mechanisms for participating in the WGTC component of the strategy: an investor could directly purchase a limited partnership interest in WGTC; an investor could purchase a promissory note from another Westridge Entity which was a limited partner of WGTC (WGTI or, in the case of IPERS, WGIA), which paid interest at a rate tied to the performance of WGTC; or an investor could purchase shares in a "feeder" fund, which in turn would purchase a promissory note from WGTI as described above. Regardless of the mechanism utilized for the WGTC component of the "enhanced equity index" strategy, investors' promised returns were tied to the performance of WGTC, and investors were told that their funds would be invested by WGTC.

10.    Instead of directing their investors' funds to WGTC as promised, however, Greenwood and Walsh misappropriated millions of dollars for their personal use and perpetuated the scheme by employing the elements of a classic Ponzi scheme: they used new investor funds to pay distributions to earlier investors; they comingled funds; they generated investor account "statements" showing fake or "plugged" earnings; and they charged investment fees based upon the fake earnings. By the time the scheme was uncovered in 2009, more than $150 million was missing from accounts of investors, including IPERS.

### IPERS's WESTRIDGE INVESTMENT

11.    On March 15, 2007, IPERS entered into an investment agreement with WCM.

12.     WCM was hired to manage an enhanced index strategy within IPERS' U.S. stock portfolio. The objective of the strategy was to produce a modest investment return greater than the return on the S&P 500 Index through the use of stock index arbitrage. WCM purchased S&P 500 Index futures to establish a "long" position in the S&P 500 stocks. After reserving some moneys for maintaining margin accounts for the futures contracts, WCM directed the remaining funds to WGTC, which was to invest solely in stock index arbitrage trades in what were supposed to be hedged trades.

13.     WGTC is a broker-dealer and a commodity pool. It is also a limited partnership. Greenwood and Walsh were its Managing General Partners and Commodity Pool Operators.

14.     WGIA was created by the operators of the fraudulent scheme solely for the purpose of receiving IPERS's investment in WGTC.

15.     On April 4, 2007, IPERS provided $396.22 million in funding to WCM. Of that amount, WCM directed $337 million to the WGTC component of the investment strategy. Although the funds moved directly from the IPERS' WCM account to WGTC, IPERS purchased a promissory note issued by WGIA (the "Note") in the amount of $337 million, and WGIA used the proceeds of the sale of the Note to purchase a limited partnership interest in WGTC. As a result, IPERS did not have a direct limited partnership investment in WGTC but had an indirect investment in WGTC by virtue of the Note. The Note was signed on behalf of WGIA by Greenwood.

16.     Under the terms of the Note, the amount of interest accruing and payable under the Note was calculated based on the rate of return earned on a limited partnership interest in WGTC in the amount of the Note.

17.     On October 20, 2008, IPERS provided additional funding of $50 million to WCM. Of that amount, WCM directed $40 million to the WGTC component of the investment strategy. The amount of the Note was increased accordingly, and the funds were used to increase the WGIA interest in WGTC.

18.     On December 1, 2008, IPERS provided additional funding of $50 million. WCM directed the entire $50 million to the WGTC component of the investment strategy. The amount of the Note was increased accordingly, and the funds were used to increase the WGIA interest in WGTC.

19.     IPERS's purchase of the Note was the purchase of a security. In addition, IPERS's acquisition of its indirect limited partnership interest in WGTC was the purchase of a security. In addition, WGIA's acquisition of an interest in WGTC was the purchase of a security.

20.     Prior to hiring WCM and investing in WGTC, IPERS conducted due diligence. During the course of its due diligence, IPERS obtained and relied upon the audit reports issued by Deloitte relating to the financial statements of WGTC for the years 2005 and 2006. In addition, prior to making its additional investment in December 2008, IPERS received, reviewed and relied upon the Deloitte audit report for 2007.

### GOVERNMENT ENFORCEMENT ACTIONS

21.     On or about February 13, 2009, the National Futures Association ("NFA"), which is the industry-wide, self-regulatory organization for the U.S. futures industry, suspended Greenwood and Walsh from trading due to their unwillingness to cooperate in an audit.

22.     NFA referred the matter to the SEC, which conducted an investigation.

23.     The SEC examiners concluded that WGTC and WCM had been operating in the "exact same fashion" since 2005. They reported that when they followed up in 2009 on "red flags" that had existed since 2005 they "immediately" discovered the fraud. The findings of the

SEC are described in a report dated October 26, 2010, and the contents of that report are incorporated herein as if fully set forth. SEC Report at 11, found at http://www.sec.gov/foia/docs/oig-533.pdf.

24.     According to the SEC examiner in 2009, the "fraud was not that hard to uncover." SEC Report at 12. The SEC examination team recognized, as Deloitte should have, that a proper examination of WGTC could not be performed without examining certain records that showed that WGTI (the unregistered/unaudited entity) was being used as a "pass-through" between WCM and WGTC and between WGTC and the investors.

25.     On February 25, 2009, after the fraudulent scheme was uncovered, the SEC took emergency action and obtained an asset freeze order against Greenwood and Walsh and their controlled entities. *SEC v. WG Trading Investors, L.P.*, 09 Civ. 1750 (S.D.N.Y.). The SEC charged violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and violating or aiding and abetting violations of Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 and Rule 206(4)-8 thereunder. The district court entered an order temporarily restraining the defendants, freezing their assets, and ordering accountings and approving the appointment of a receiver over WGTC, WCM, WGTI, WGI, and other Westridge Entities. The allegations of the complaint in that action are incorporated herein by reference as if fully set forth.

26.     The U.S. Attorney's Office for the Southern District of New York pursued criminal charges against Greenwood and Walsh, and a Grand Jury indicted them. *United States v. Greenwood*, 09 Crim. 722 (MGC) (S.D.N.Y.). The allegations of the indictment in that case are incorporated herein by reference as if fully set forth.

27.     Greenwood pleaded guilty to the criminal charges in the indictment.

28.     The U.S. Attorney also brought criminal securities fraud charges against Deborah Duffy, the Chief Compliance Officer of WGTC, *United States v. Duffy*, 09 Cr. 709. The allegations of the Information in that case are incorporated herein as if fully set forth.

29.     Duffy pleaded guilty to the charges in the Information.

30.     The CFTC filed related charges against Walsh and Greenwood. *CFTC v. Walsh*, 09 Civ. 1749 (GBD) (S.D.N.Y.). The allegations of the complaint in that action are incorporated herein by reference as if fully set forth.

31.     Greenwood agreed to settle the SEC's charges, and on July 29, 2010, the district court entered a consent judgment against him. The judgment provides for the payment of disgorgement plus prejudgment interest, and the imposition of civil monetary penalties, in amounts to be determined at a later date.

32.     Greenwood agreed to settle the charges in the action brought by the CFTC.

33.     The SEC filed a civil complaint against Duffy. *Securities and Exchange Commission v. Duffy*, 09 Civ. 6458. The allegations of that complaint are incorporated herein as if fully set forth.

34.     Duffy settled the SEC's civil case and consented to a judgment being entered against her.

35.     The criminal and civil proceedings against Walsh are ongoing.

### THE RECEIVER

36.     On February 25, 2009, on the nomination of the SEC and the CFTC, the district court appointed Robb Evans & Associates LLC as Temporary Receiver ("Receiver") of WCM, WGTC, WGTI, WGI and other Westridge Entities. The Receiver has submitted two reports to the Court, dated April 27, 2009 and June 3, 2010, respectively. The Receiver's investigation revealed a long history of WGTC's and WGTI's practice of comingling funds, operating with

utter disregard for corporate governance, and employing fraudulent accounting practices in an apparent attempt to conceal the true financial condition of the entities from investors, potential investors and, in the case of WGTC, its regulators. The findings of those reports to the Court are incorporated herein as if fully set forth.

37.    On March 20, 2011, Judge Daniels approved a *pro rata* net investment distribution plan proposed by the Receiver and recommended by the SEC and the CFTC. On or about April 22, 2011, the Receiver made an initial distribution of approximately $792 million to investors injured by the investment fraud. The distribution was the first distribution by the Receiver and constitutes a return to investors of nearly 85% of approved claims.

### LOSSES SUFFERED BY IPERS

38.    On February 13, 2009, IPERS received notice that NFA had suspended Greenwood and Walsh from trading.

39.    On February 16, 2009, IPERS terminated WCM's contract and requested immediate return of its investments. That request was not honored.

40.    IPERS's total investment in the WCM strategy was $496.22 million.  Of that total investment, the total investment in the WGTC component of the strategy was $427 million. Distributions to cover margin calls for the S&P 500 futures component of the strategy reduced that number to $253.4 million: the amount of IPERS's allowed "net investment" claim in the Receivership proceeding. IPERS received $215,226,135.10 as part of the initial distribution in the Receivership proceeding. Thus, IPERS still has not recovered $38,173,864.90 of its "net investment" in the WGTC component of the WCM investment strategy.

41.    IPERS has recovered nothing on account of the income or capital appreciation that it would have earned had its money been invested in a legitimate entity. In addition, IPERS

made separate payments directly to WCM totaling $1,345,775 for fees allegedly earned on the IPERS investment.

**DELOITTE'S MISREPRESENTATIONS**

42.     Deloitte was, at all relevant times, the independent outside auditor for WGTC and provided audit services to WGTC.

43.     While serving as the independent outside auditor for WGTC, Deloitte issued unqualified and/or "clean" opinions on WGTC's financial statements for fiscal years 2001 through 2007, inclusive. Deloitte consented to and caused the incorporation by reference of its unqualified and/or "clean" opinions on WGTC's financial statements for each of those fiscal years.

44.     On February 28, 2007, during the due diligence it performed prior to hiring WCM and investing in WGTC, IPERS received WGTC's Financial Statements and Supplemental Schedules for the Year Ended December 31, 2005 together with Deloitte's Independent Auditor's Report and Supplemental Report on Internal Control of WGTC, dated February 24, 2006.

45.     On February 28, 2007, during the due diligence it performed prior to hiring WCM and investing in WGTC, IPERS also received WGTC's Financial Statements and Supplemental Schedules for the Year Ended December 31, 2006 together with Deloitte's Independent Auditor's Report and Supplemental Report on Internal Control of WGTC, dated February 16, 2007.

46.     On November 5, 2008, IPERS received WGTC's Financial Statements and Supplemental Schedules for the Year Ended December 31, 2007 together with Deloitte's Independent Auditor's Report and Supplemental Report on Internal Control of WGTC, dated February 25, 2008.

47.     In each of Deloitte's audit reports for WGTC for 2005, 2006, and 2007, Deloitte represented that (with immaterial variations):

    a.  "We have audited the ... financial statements" of WGTC for the fiscal years 2005, 2006 and 2007, respectively.

    b.  "We conducted our audit in accordance with auditing standards generally accepted in the United States of America."

    c.  "We believe that our audit provides a reasonable basis for our opinion."

    d.  "In our opinion, such financial statements present fairly, in all material respects, the financial position of [WGTC] at December 31, 2005 [2006 and 2007, respectively], and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America."

    e.  WGTC's supplemental schedules setting forth its Computation of Net Capital and its Determination of Reserve Requirements "have been subjected to the auditing procedures applied in our audit of the basic financial statements and, in our opinion, are fairly stated in all material respects when considered in relation to the basic financial statements taken as a whole."

48.     For each of 2005, 2006 and 2007 audits, Deloitte also issued Independent Auditors 'Report on Internal Controls required by SEC Rule 17a-5 and CFTC Regulation 1.16. In each of its Independent Auditors' Reports on Internal Controls for WGTC for the years 2005, 2006, and 2007, Deloitte represented that:

    a.  "In planning and performing our audit of the financial statements ... we considered [WGTC's] internal control, including control activities for

safeguarding securities, in order to determine our auditing procedures for the purpose of expressing an opinion on the financial statements and not to provide assurance on the Partnership's internal control."

b. In considering WGTC's internal control "we noted no matters involving the Partnership's internal control and its operation, including control activities for safeguarding securities, that we consider to be material weakness as defined above." The reports defined "material weakness" as "a condition in which the design or operation of one or more of the internal components does not reduce to a relatively low level the risk that misstatements caused by error or fraud in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions."

DELOITTE'S SCIENTER

49. In connection with its audit of WGTC for 2005, 2006 and 2007, Deloitte's auditing practices were so deficient that the audits amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful, and the professional judgments which it made were such that no reasonable auditor would have made the same decisions if confronted with the same facts. Accordingly, the following statements by Deloitte were materially false and misleading when made:

a. "We have audited the … financial statements" of WGTC for the fiscal years 2005, 2006 and 2007;

b. "We conducted our audit in accordance with auditing standards generally accepted in the United States of America";

c. "We believe that our audit provides a reasonable basis for our opinion."

d. "In our opinion, such financial statements present fairly, in all material respects, the financial position of [WGTC] at December 31, 2005 [2006 and 2007, respectively], and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America";

e. WGTC's supplemental schedules setting forth its Computation of Net Capital and its Determination of Reserve Requirements "have been subjected to the auditing procedures applied in our audit of the basic financial statements and, in our opinion, are fairly stated in all material respects when considered in relation to the basic financial statements taken as a whole";

f. "In planning and performing our audit of the financial statements ... we considered [WGTC's] internal control, including control activities for safeguarding securities, in order to determine our auditing procedures for the purpose of expressing an opinion on the financial statements and not to provide assurance on the Partnership's internal control"; and

g. In considering WGTC's internal control, Deloitte "noted no matters involving the Partnership's internal control and its operation, including control activities for safeguarding securities, that we consider to be material weakness."

50.   Plaintiff's allegation that Deloitte's auditing practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful, or that the professional judgments which it made were such that no reasonable auditor would have made the same decisions if confronted with the same facts is based on the following particulars:

a.  When an SEC examination team conducted an investigation following a referral from the NFA, according to the SEC "the fraud was easily uncovered."

b.  The SEC examiners concluded that WGTC and WCM had been operating in the "exact same fashion" in 2009 as they had in 2005 and that following up on "red flags" that had existed since 2005 "immediately" led to the discovery of the fraud.

c.  According to the SEC examiner in 2009, the "fraud was not that hard to uncover." He explained, "all you really had to do was look at the amount of net assets that were on Westridge's books, compare that with the amount of money that WG Trading was representing that they were managing, and those amounts just didn't tie out." Deloitte should have performed that "simple analysis" with respect to each of the years ended 2005, 2006 or 2007. Had it done so, it would have "easily" and "immediately" learned of the fraud.

d.  The SEC examination team recognized, as Deloitte should have, that a proper examination of WGTC could not be performed without examining certain WGTC records that showed that WGTI (the unregistered/unaudited entity) was being used as a "pass-through" between WCM and WGTC and between WGTC and the investors. Deloitte should have examined those records as part of its routine audit procedures designed and performed in connection with the audit of WGTC. Had it done so, it would have "easily" and "immediately" learned of the fraud.

e.  As detailed in the Receiver's reports, WGTC and WGTI both had elements of a classic Ponzi scheme, and neither entity could have survived without the financial support of investor funds raised by the other entity at different points in time from January 1, 1996 through February 25, 2009.

f.   As the Receiver concluded based on his investigation, neither WGTC nor WGTI was individually profitable or sustainable. As a result of the structure that Walsh and Greenwood employed, however, it was possible, through interpartnership accounting entries and transfers between WGTC and WGTI, for WGTC to be made to *appear* to be profitable even though it was not. The structure that Greenwood and Walsh employed is commonly employed to carry out a Ponzi scheme.

g.   While WGTC and WGTI were organized as two separate limited partnerships and were presented to their investors as two stand-alone entities, as detailed in the Receiver's reports, WGTC and WGTI in reality were financially inseparable and had to be operated as a single entity to support the myth that they were stand-alone entities. The operations of WGTC and WGTI, when considered as a single entity, had the elements of a classic Ponzi scheme.

h.   As detailed in the Receiver's reports, the basic structure of the entities of which WGTC was a part posed an inherent and heightened risk of asset misappropriation and financial report misstatement that Deloitte should have recognized. Indeed, the structure of the entities of which WGTC was a part was very similar to that of E.S.M. Government Securities, Inc. ("ESM"), a Florida corporation formerly engaged in the securities brokerage business in Florida. ESM was a parent and holding company for several subsidiaries and specialized in term repurchase and reverse repurchase transactions involving government entities. In the late seventies, ESM retained Alexander Grant & Company ("Grant") as its independent accountant to perform audits. On March 4, 1985, the SEC filed a

complaint for injunctive relief against ESM alleging violations of the Exchange
Act. ESM and its affiliates consented to the complaint and the district court
entered a permanent injunction on March 6, 1985. After an involuntary Chapter 7
petition was filed on March 26, 1985, ESM was adjudicated bankrupt. Thereafter,
approximately twenty actions were brought against Grant. The complaints, filed
by a private individual, several financial institutions, and government entities,
sought recovery for damages allegedly sustained by detrimental reliance on
inaccurate financial statements prepared by Grant. The theories advanced by the
plaintiffs included common-law fraud, ordinary, professional and gross
negligence, and violations of (1) Section 10(b) of the Exchange Act; (2) Securities
and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5 (1986); (3) the
Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 *et seq.*
(1982); (4) the Florida Securities Act, Fla. Stat. Ann. § 517.301 (West
Supp.1986); and (5) the Florida Racketeer Influenced and Corrupt Organization
Act, Fla. Stat. Ann. §§ 895.02 and 895.03 (West Supp.1986). *See In re Alexander
Grant & Co. Litig.*, 820 F.2d 352, 353-54 (11th Cir. 1987).

i.   The ESM case and other examples of similar historic audit failures are taught to
auditors as part of their training as examples of "red flags" and/or indicia of
possible fraud to look for and to be on guard for in conducting audits.

j.   Deloitte should have recognized well known tell-tale structural characteristics that
WGTC and its affiliates shared with ESM and its affiliates or that otherwise
suggested that WGTC was part of a Ponzi scheme, including:

i.   All accounting processes and internal controls were performed by the same employee.

ii.  WGTC received funds from WGTI's investors.

iii. WGTC made payments to or for WGTI's investors.

iv.  WGTC's investors received funds from WGTI.

v.   WGTC's investors made payments to WGTI.

vi.  WGTC paid employee advances directly to or for Greenwood and Walsh and charged the payments as reductions of WGTI's capital in WGTC.

vii. WGTI paid employee advances directly to or for Greenwood and Walsh, and recorded the payments as receivables due from Greenwood and Walsh instead of as increases of its investment in WGTC.

viii. WGTC paid employee advances to or for Greenwood and Walsh and WGTI reimbursed WGTC and recorded the payments as receivables due from Greenwood and Walsh instead of as increases of its investment in WGTC.

ix.  As described in the Receiver's first report to the Court, employee advances due from Greenwood and Walsh to WGTI at the end of any particular year were reclassified to notes receivable due from Greenwood and Walsh in the following year. Employee advances paid by WGTC were charged against WGTI's capital in WGTC, but did not reduce any other partner's capital in WGTC, and were recorded by WGTI as receivables. Consequently, WGTC's books did not carry any asset or expense item in

connection with its payments to Greenwood and Walsh and therefore its books were "clean" for the auditors to examine.

x. All payments made by either WGTI or WGTC to James Carder, totaling approximately $8.9 million in years 1998 through 2008, were all expensed to WGTI as professional fees.

xi. WGTI made no entries regarding its transfers of bank interest income to WGTC between June 30, 2006 and December 31, 2008, while WGTC recorded these receipts from WGTI as income.

xii. WGTC, on a monthly basis, first allocated to its limited partners, except for WGTI, gross earnings computed using rates of return determined by Greenwood and deducted from gross earnings management and performance fees. WGTC then plugged to WGTI the difference between the actual monthly net income/loss and the net earnings allocated to its other limited partners. The management and performance fees charged to other limited partners were recorded by WGTI as income and increases of its investment in WGTC.

xiii. WCM also prepared a monthly Summary of Investment Portfolio and mailed the summary to each investor. This summary included the total cash and equivalents and a line for Miscellaneous Securities. The value for the Miscellaneous Securities was taken from a single page statement forwarded each month from the WGTC/WGTI office in Jersey City, N J. The statement was titled "Statement of Capital Account" and included the following statement: "Scheduled below is an analysis of the changes in

your capital account in **WG Trading Company LP**" (emphasis original).
This wording appeared on each single page statement, whether or not the
investment was a direct limited partnership interest with WGTC or an
indirect investment though a note or stock ownership in another Westridge
fund controlled by Walsh and Greenwood.

k.  As the Receiver concluded based on his investigation, WGTC and WGTI were, in
substance, one and the same, but Deloitte only purported to audit WGTC.

l.  Since it was obvious, from the accounting books and records of WGTC, that
WGTC and WGTI were being operated as a single entity, Deloitte could not have
expressed any clean audit opinion concerning WGTC without having properly
audited the interpartnership account of WGTI in the accounting books and records
of WGTC.

m.  The heightened audit risk associated with the structural red flags described above
was further heightened by the actual commingling of funds between WGTC and
WGTI described above and detailed in the Receiver's Report.

n.  Deloitte should have recognized the heightened audit risk associated with both the
lack of separateness and the actual commingling and should have employed more
rigorous auditing practices as a result.

o.  As shown in the Receiver's reports, earnings and income reported to investors
were based not on any actual earnings or income but rather on fictional rates
arbitrarily invented by Greenwood. Since the reports were based not on actual
earnings or income but on an arbitrary rate of return – a fiction– it would have
been *impossible* for any auditor to measure or verify the claimed earnings and

income reported to investors on their monthly schedules. Further, the rate of return used for all WGTC investors other than WGTI was different from that used for WGTI in its capacity as an investor in WGTC.

p. The books and records of WGTC reflect numerous transactions involving the movement of funds back and forth between WGTC and WGTI. This movement would have been visible to Deloitte as a result of its examination of the books and records of WGTC. Had Deloitte not been reckless in connection with its purported audit of the books and records of WGTC, it would have become aware of numerous questionable transactions involving WGTI, including:

    i. Of WGTC's 2007 net income of $101,238,715, $94,303,151 was allocated to all limited partners other than WGTI based on their open equities in WGTC, and the remainder of $6,935,564 was allocated, i.e. plugged, to WGTI. The $6,935,564 allocated by WGTC to WGTI as a limited partner also included the performance fee of $1,174,209 charged to limited partners other than WGTI. Pursuant to the Performance Allocation clause of WGTC's Limited Partnership Agreement, the $1,174,209 performance fee resulting from the $101,238,715 net income was to be allocated to the two managing general partners, Greenwood and Walsh. However, WGTC's 2007 books and records did not show the allocation of the $1,174,209 performance fee as allocations of net income to the two managing general partners; instead, WGTC's 2007 books and records showed the allocation of the $1,174,209 performance fee as an allocation of net income to WGTI. Consequently, for income tax reporting purposes,

the $1,174,209 performance fee was not reported by WGTC as personal income of Greenwood and Walsh. These facts would have been recognized by any competent auditor as evidence of tax evasion.

ii. Investor funds were commingled between WGTC and WGTI. There were instances in which WGTC's limited partners' funds were received by WGTI while WGTC's note holders' funds were received by WGTC, and WGTC's limited partners were paid by WGTI while a WGTI note holder was paid by WGTC. In addition, WGTC advanced the variation margin deposits on behalf of certain note holders of WGTI. This commingling of funds was a red flag.

iii. The employee advances referred to above.

iv. Payments to Carder referred to above.

v. WGTI invested in WGTC. As a result the books and records of both companies should have at all times reflected that WGTI had invested in WGTC. However, there were at least three months in which the relationship was inappropriately "flipped," that is, WGTC was shown as having invested in WGTI.

q. Deloitte failed to conduct its audits of WGTC for the years ended December 31, 2005 through December 31, 2007, in accordance with auditing standards generally accepted in the United States of America. In particular, but not by way of limitation, Deloitte failed to conduct its audits in accordance with the professional practice standards established by the Public Company Accounting

Oversight Board ("PCAOB") including, but not limited to the following standards:

    i.   Generally Accepted Auditing Standards (PCAOB Interim Standard AU Section 150), General Standard number 3;

    ii.   Due Professional Care in the Performance of Work (PCAOB Interim Standard AU Section 230);

    iii.   Consideration of Fraud in a Financial Statement Audit (PCAOB Interim Standard AU Section 316); and

    iv.   Related Parties (PCAOB Interim Standard AU Section 334).

51.    The foregoing facts would be regarded by any competent auditor as significant, problematic, bright red flags. In failing to heed them, Deloitte's auditing practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful, or that the auditing judgments which it made were such that no reasonable auditor would have made the same decisions if confronted with the same facts.

52.    Had Deloitte not been reckless, it would have learned of the fraud, including, among other things, the fact that Walsh and Greenwood were playing games with the income allocations and that they were simply reporting invented income to investors. The scheme finally was exposed because the schemers refused to cooperate in an audit by NFA. The schemers knew that any competent independent audit would have "easily" and "immediately" revealed their fraud, as, indeed, it "easily" and "immediately" did.

53.    The foregoing facts also support an inference, and therefore Plaintiff alleges, that Deloitte was guilty of willful blindness, i.e., that Deloitte subjectively believed there was a high

probability that WCM was breaching its fiduciary duties to its clients and Deloitte took deliberate actions to avoid learning of that fact.

JUSTIFIABLE RELIANCE

54.     Deloitte knew, or should have known, that potential investors were relying on the foregoing representations and on WGTC's financial statements.

55.     IPERS actually and justifiably relied on Deloitte's Independent Auditor's Reports and Supplemental Reports on Internal Control of WGTC for the Years Ended December 31, 2005 and 2006 and, in particular, on the representations quoted above, in (i) deciding to hire WCM, (ii) deciding to continue to retain WCM after WCM was first hired, (iii) deciding to purchase the Note and its indirect limited partnership interest in WGTC, (iv) deciding to continue its investments in the Note and WGTC, and (v) deciding to make additional investments in the Note and indirect limited partnership interests in WGTC after its initial investments.

56.     IPERS actually and justifiably relied on Deloitte's Independent Auditors' Report and Supplemental Report on Internal Control of WGTC for the Year Ended December 31, 2007 and, in particular, on the representations quoted above, in (i) deciding to continue to retain WCM, (ii) deciding to continue its investments in WGTC, and (iii) deciding on or about December 1, 2008 to invest an additional $50 million in the Note and indirect limited partnership interest in WGTC.

FIRST CLAIM

(VIOLATION OF § 10(B) (15 U.S.C. § 78J) AND RULE 10B-5)

57.     IPERS repeats and realleges all of the paragraphs above as if fully set forth herein.

58.     In connection with the purchase or sale of securities and in violation of Section 10(b) of the Exchange Act, as amended, 15 U.S.C. § 78j, and SEC Rule 10b-5 promulgated thereunder, Defendant:

    a.   Employed a device, scheme, or artifice to defraud;

    b.   Made untrue statements of material facts, or omitted to state material facts necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading; and

    c.   Engaged in acts, practices, or courses of business that operated or would operate as a fraud or deceit upon IPERS, in connection with the purchase or sale of a security.

59.     Deloitte's auditing practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful, or that the auditing judgments which it made were such that no reasonable auditor would have made the same decisions if confronted with the same facts.

60.     Deloitte knew, or was reckless in not knowing, the truth but misrepresented the truth or concealed it from investors.

61.     Deloitte's misrepresentations and omissions were material to IPERS's decision to invest in WGTC.

62.     IPERS justifiably relied on Deloitte's misstatements and omissions and suffered injury as a result.

63.     Deloitte's misrepresentations and omissions induced IPERS to purchase the Note and its indirect limited partnership interest in WGTC.

64.     If IPERS had known the truth, IPERS would not have purchased the Note and its indirect limited partnership interest in WGTC at any price.

65.     The realization of the risks that Deloitte's misrepresentations and omissions concealed was the proximate cause of the loss that IPERS suffered.

66.     By reason of Deloitte's misrepresentations and omissions, Deloitte is liable to IPERS in an amount to be proved at trial.

### SECOND CLAIM

### (PARTICIPATION IN BREACH OF FIDUCIARY DUTY)

67.     IPERS repeats and realleges all of the paragraphs above as if fully set forth herein.

68.     WCM breached its fiduciary duties to IPERS.

69.     Deloitte knowingly participated in and provided substantial assistance to the breach of fiduciary duty by WCM.

70.     As a result of Deloitte's knowing participation in and substantial assistance to the breach of fiduciary duty by WCM, IPERS suffered damage.

71.     Once IPERS hired WCM, fiduciary duties arose between IPERS on the one hand and WCM. WCM breached its fiduciary duties to IPERS by failing to invest IPERS funds in the manner WCM had agreed and by instead investing in a Ponzi scheme.

72.     Deloitte knew that WCM provided investment advisory services to its clients and therefore knew that WCM owed fiduciary duties to its clients.

73.     Deloitte knew that WCM advised its clients to invest in WGTC.

74.     Deloitte knew that WCM provided its clients with copies of Deloitte's Independent Auditor's Reports and Supplemental Reports on Internal Control of WGTC.

75.     Deloitte knew that WCM's clients would rely on Deloitte's Independent Auditor's Reports and Supplemental Reports on Internal Control of WGTC in deciding whether to invest, or continue to invest, in WGTC, and in deciding whether to continue their relationship with WCM.

76.     The facts alleged above support an inference, and therefore Plaintiff alleges, that in connection with WCM's breaches of fiduciary duty to their clients, including Plaintiff, Deloitte was guilty of willful blindness, to wit: Deloitte subjectively believed there was a high probability that WMC was breaching its fiduciary duties to its clients and Deloitte took deliberate actions to avoid learning of that fact.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment awarding:

   a.   Compensatory damages in an amount to be determined at trial;

   b.   Punitive damages in an amount to be determined at trial;

   c.   Interest, costs, attorneys' fees, and disbursements allowable by law; and

   d.   Such other and further relief as the Court may deem just and proper.


[Balance of Page Intentionally Left Blank]

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  March 21, 2012

_____
Paul J. Hanly, Jr.
Thomas I. Sheridan, III

HANLY CONROY BIERSTEIN SHERIDAN FISHER
& HAYES LLP
112 Madison Avenue
New York, NY 10016
212-784-6401
phanly@hanlyconroy.com
212-784-6404
tsheridan@hanlyconroy.com

and

Jeffrey S. Thompson (Pro Hac
Deputy Attorney General
Iowa Department of Justice
Hoover Building
1305 East Walnut
Des Moines, IA 50319
515-281-4419
jeffrey.thompson@iowa.gov

*Attorneys for Plaintiff*