UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                 :

IOWA PUBLIC EMPLOYEE'S RETIREMENT  :
SYSTEM,
                         Plaintiff,   :        12 Civ. 2136 (JPO)
                                   :

            -v-                    :      MEMORANDUM AND
                                   :          ORDER
DELOITTE & TOUCHE LLP,         :
                       Defendant.  :
                                   :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

       Plaintiff Iowa Public Employees' Retirement System ("IPERS") brings this action against

Deloitte & Touche LLP ("D&T"). The claims in this case arise out of D&T's audits of its client,

registered broker-dealer WG Trading Company, LP ("WGTC"). IPERS alleges violations of §

10(b) of the Exchange Act ("the '34 Act"), pursuant to SEC Rule 10b-5, and breach of fiduciary

duty, under a theory of aiding or abetting. Defendant D&T has moved to dismiss the complaint,

arguing that IPERS has not adequately stated claims under the heightened pleading standards

imposed by the Private Securities Litigation Reform Act ("the PSLRA"). For the reasons that

follow, Defendant's motion to dismiss is granted.

## I.    Background

### A.    Factual Background[1]

       This case stems from a multi-million-dollar fraud perpetrated on the investing public.

While the consequences of such fraud are dire indeed, the PSLRA limits the extent to which

---

[1] These facts are taken from IPERS' Complaint and, for purposes of a motion to dismiss, are
presumed true.

outside auditors—only indirectly involved with any wrongdoing—may be held accountable for investors' losses.

"[A]cting through companies they controlled," Paul Greenwood ("Greenwood"), Stephen Walsh ("Walsh"), and others conducted a fraudulent investment scheme from 1996 until early 2009. (Complaint, Dkt. No. 1 ("Compl."), at ¶¶ 7-8.) WGTC, a registered broker-dealer, was one such company. Also involved were the entities Westridge Capital Management, Inc. ("WCM"), a registered investment adviser, WG Trading Investors, L.P. ("WGTI"), an unregistered "investment vehicle," and WGIA LLC ("WGIA"), "an entity created specifically to facilitate IPERS' investment." (*Id.* at ¶ 7.)

To perpetrate their fraud, Greenwood and Walsh obtained investments from numerous institutional investors, such as educational institutions, public pensions, and retirement plans, encouraging them to: (1) purchase a limited partnership interest in WGTC; (2) purchase a promissory note from another entity that was a limited partner of WGTC, such as WGTI; or (3) purchase shares in a "feeder fund," which would purchase a promissory note from WGTI, purportedly on the investor's behalf. WGTC was the apparently legitimate face of all these entities, as investors were told that it would invest their funds. (*Id.* at ¶¶ 9-10.)

Greenwood and Walsh did not manage investors' funds as promised, and instead, stole millions for their own personal use. They managed to maintain the illusion of profitability by creating a "classic Ponzi scheme." (*Id.* at ¶ 10.) The two used new investors' funds to pay their earlier investors; they failed to keep funds discrete, and instead engaged in commingling; they created fraudulent account statements; and they "charged investment fees based upon the fake earnings." (*Id.*).

IPERS first invested in WGTC in 2007, providing nearly $400 million to WCM, which, in turn, placed $337 million of that money in WGTC. IPERS did not have a direct limited partnership investment in WGTC, but rather, was indirectly partnered with the entity; that is, it purchased a promissory note issued by WGIA in the same amount, which WGIA then utilized to purchase the partnership interest in WGTC. (*Id.* at ¶ 15.)

Over the next year, IPERS invested another $100 million in WGTC, also through the same promissory note approach. Thus, WGIA's partnership interest in WGTC increased with each subsequent IPERS investment. (*Id.* at ¶¶ 17-18.)

Greenwood and Walsh's fraud came to light in 2009, when the National Futures Association (the "NFA") suspended them from trading after they refused to submit to an audit. Accordingly, the NFA brought the matter to the attention of the SEC, prompting an investigation. (*Id.* at ¶¶ 21-22.) After the fraud was discovered, the SEC charged WGTI with violations of the Securities Act of 1933 ("the '33 Act"), the '34 Act, and the Investment Advisers Act of 1940 ("the IAA"), obtaining an emergency asset freeze against Greenwood and Walsh. (*Id.* at ¶ 25.) The U.S. Attorney's Office for the Southern District of New York brought criminal charges against Greenwood and Walsh, and the CFTC also brought related civil charges against the two. (*Id.* at ¶¶ 26, 30.) While Greenwood pleaded guilty to his criminal charges (*id.* at ¶ 27), and settled his civil charges (*id.* at ¶¶ 31-32), the proceedings against Walsh are still pending (*id.* at ¶ 35).

In February 2009, upon the recommendation of the SEC and the CFTC, the district court appointed a Temporary Receiver (the "Receiver") of WCM, WGTC, WGTI, and WGIA. (*Id.* at ¶ 36.) The Receiver's investigation confirmed the longstanding fraud that had existed within these entities, and as a result of its findings, Judge Daniels accepted a "*pro rata* net investment

distribution plan" to reimburse defrauded investors, including IPERS. (*Id.* at ¶ 37.) In April 2011, the Receiver distributed nearly $800 million to Greenwood and Walsh's investors—which reflects "a return to investors of nearly 85% of approved claims." (*Id.*)

Over the course of its relationship with WCM, IPERS invested nearly $500 million, $427 million of which was placed with WGTC. (*Id.* at ¶ 40.) IPERS' eventual "net investment" claim with respect to the receivership transaction was approximately $250 million, $215 million of which IPERS received as a result of the Receiver's original distribution. (*Id.*) Thus, IPERS still seeks approximately $38 million of its "net investment" in WGTC (*id.*), along with around $1 million in "fee" payments, made directly to WCM. (*Id.* at ¶ 41.)

At all relevant times, WGTC was a registered broker-dealer, meaning it was "subject to the jurisdiction and regulation" of the CFTC, SEC, and the Financial Industry Regulatory Authority ("FINRA"). (Defendant's Memorandum in Support of Motion to Dismiss, Dkt. No. 21 ("Def.'s Memo), at 4.) WGTC, as the legitimate face of Greenwood and Walsh's Ponzi scheme, was also part of both the NFA and the New York Stock Exchange ("the NYSE"). (*Id.*)

During fiscal years 2001 through 2007, D&T served as the outside auditor for WGTC, issuing clean opinions regarding the state of WGTC's financials throughout that period. (Compl. at ¶ 43.) D&T represented that its audits of WGTC's financial statements for 2005, 2006, and 2007 were performed in accordance with Generally Accepted Auditing Standards ("GAAS"), and also that WGTC's representations conformed with Generally Accepted Accounting Principles ("GAAP"). (Def.'s Memo. at 4.)

Before investing in WGTC, IPERS received several of D&T's independent auditor's reports. (Compl. at ¶¶ 44-46.) Each audit report stated, *inter alia*, that: (1) the audit was conducted according to GAAS; (2) the audit provided a "reasonable basis" for D&T's opinion;

and (3) the financial statements appeared to "present fairly, in all material respects," WGTC's financial position for a given year. (*Id.* at ¶ 47.) Moreover, for fiscal years 2005, 2006, and 2007, D&T also issued "Independent Auditors' Report on Internal Controls required by SEC Rule 17a-5 and CFTC Regulation 1.16." In these internal control reports, D&T stated, *inter alia*, that: (1) it "considered [WGTC's] internal control, including control activities for safeguarding securities, in order to determine [its] auditing procedures for the purpose of expressing an opinion on the financial statements and not to provide assurance on the Partnership's internal control;" and (2) there were "no matters involving the Partnership's internal control and its operation" that D&T "consider[ed] to be material weakness[es]." (*Id.* at ¶ 48.)[2]

### B.  The Allegations in the Complaint

At bottom, IPERS' allegations stem from the contention that D&T's "auditing practices were so deficient that the audits amounted to no audit at all." (*Id.* at ¶ 49.) According to the Complaint, D&T's failure to "see the obvious" and "investigate the doubtful" constitutes behavior in which no reasonable auditor would have engaged. (*Id.*) IPERS argues that D&T's statements associated with its audits and internal controls examinations, were materially false in light of myriad "red flags," which D&T ignored, that would have put a reasonable auditor on notice that WGTC's financial statements were not all that they seemed. (*See generally id.* at ¶¶ 23, 50.)

More specifically, IPERS claims that the ease with which the SEC discovered the fraud underscores D&T's failure, noting that the SEC examiner had stated in 2009 that the "fraud was not that hard to uncover." (*Id.* at ¶ 50(c).) Moreover, IPERS states that neither WGTC nor WGTI

---

[2] This Court may consider D&T's audit reports for the purposes of this motion to dismiss, as the allegations in the complaint stem from the reports themselves, and were "possessed by or known to the plaintiff and upon which [the plaintiff] relied in bringing the suit." *See In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 382 (S.D.N.Y. 2007) (quotations omitted).

was "individually profitable or sustainable" (*id.* at ¶ 50(f)), nor were they actually "stand-alone entities," as they were portrayed to investors (*id.* at ¶ 50(g)). Instead, WGTC and WGTI were "financially inseparable." (*Id.*)

Other "red flags" (*id.* at ¶ 23) that, according to IPERS, D&T should have discovered, were the facts that all "accounting processes and internal controls were performed by the same employee" (*id.* at ¶ 50(j)(i)); that WGTC and WGTI received funds from each other's investors (*id.* at ¶ 50(j)(ii)-(b)); that WGTC paid employee advances to Greenwood and Walsh, charging them as reductions of WGTI's capital in WGTC, rather than increases of its investment in WGTC (*id.* at ¶ 50(j)(vi)); that WGTI did not enter its transfers of bank interest income to WGTC from 2006 through 2008, but WGTC nevertheless recorded these receipts as income (*id.* at ¶ 50(j)(xi)); that WGTC "plugged to WGTI the difference between [] actual monthly net income/loss and the net earnings allocated to its other limited partners, which were recorded by WGTI as an increase in its investment in WGTC" (*id.* at ¶ 50(j)(xii)); and myriad abnormalities associated with WCM's monthly investment portfolio summary, which it mailed to investors (*id.* at ¶ 50(j)(xiii).)

Moreover, according to IPERS, the books and records of WGTC reveal transactions dealing with the movement of funds between WGTC and WGTI. (*Id.* at ¶ 50(p).) IPERS argues that this movement would have been apparent to D&T as it audited WGTC's books, and thus, D&T would have been on notice of "questionable transactions" involving WGTI. (*Id.*) Among these transactions are tax abnormalities associated with the allocation of performance fees (*id.* at ¶ 50(p)(i)); commingling of investor funds between WGTC and WGTI (*id.* at ¶ 50(p)(ii)); employee advances; and an "inappropriate flip" of the relationship between WGTC and WGTI,

meaning that WGTC—the investee—"was shown as having invested in WGTI" (*id.* at ¶ 50(p)(v).)

In sum, IPERS contends that "since it was obvious, from the accounting books and records of WGTC, that WGTC and WGTI were being operated as a single entity," it was impossible for D&T to express a "clean audit opinion concerning WGTC without having properly audited the interpartnership account of WGTI in the accounting books and records of WGTC." (*Id.* at ¶ 50( l).) Associated with these alleged audit failures, IPERS also alleges particular violations of the Public Company Accounting Oversight Board ("the PCAOB") including AU Section 150, General Standard number 3; AU Section 230; AU Section 316; and AU Section 334. (*Id.* at ¶ 50(q).)

IPERS alleges that D&T was reckless in not investigating the "truth" about the Westridge entities—red flags that would have revealed Walsh and Greenwood's Ponzi scheme. (*Id.* at ¶¶ 23, 60.) Therefore, *a fortiori*, any statements D&T made in reference to the soundness of WGTC's financial statements were necessarily misrepresentations born of a reckless auditing deficiency. (*Id.* at ¶¶ 60-61.) In turn, IPERS claims that it justifiably relied on these misrepresentations, causing it to invest in a sham, and thus lose millions. (*Id.* at ¶¶ 64-66.)

The two claims in the Complaint are (1) an allegation of securities fraud, pursuant to Rule 10b-5 of the '34 Act, and (2) breach of fiduciary duty (*id.* at ¶¶ 57-76), alleging that liability attaches to D&T under a theory of aiding and abetting (*id.* at ¶¶ 67-76; Def.'s Memo. at 23).

### C.    Procedural History

On May 7, 2012, D&T filed its motion to dismiss IPERS' complaint. D&T moved on several grounds, arguing that: (1) with respect to 10b-5, the complaint failed to allege a false statement made by D&T or WGTC with sufficient particularity, or, alternatively, did not

establish an inference of scienter; and (2) IPERS failed to adequately plead its claim of aiding

and abetting the fraud. (Def.'s Memo. at i-ii.)

## II.     Discussion

### A.     Legal Standard

As a general rule, when deciding a motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6), a court is obliged to "accept as true all of the factual allegations contained in

the complaint," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 572 (2007), drawing "all

inferences in the light most favorable to the non-moving party's favor." *In re NYSE Specialists

Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007). Moreover, courts deciding motions to dismiss are

"not limited to the face of the complaint," but "may [also] consider any written instrument

attached to the complaint, statements or documents incorporated into the complaint by reference,

legally required public disclosure documents filed with the SEC, and documents possessed by or

known to the plaintiff and upon which it relied in bringing the suit." *In re Scottish*, 524 F. Supp.

2d at 382 (quotations omitted) (alteration in original).

While Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement of

the claim showing that the pleader is entitled to relief" Fed. R. Civ. P. 8(a)(2), it is well settled

that the complaint must do more than plead facts that "do not permit the court to infer more than

the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In other words,

in order to properly state a claim and avoid dismissal, a plaintiff must state "the grounds upon

which his claim rests through factual allegations sufficient 'to raise a right to relief above the

speculative level.'" *ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)

(quoting *Twombly*, 550 U.S. at 546). At bottom, to survive a motion to dismiss, a plaintiff's facts

must give rise to a plausible narrative supporting their claim. *See Twombly*, 550 U.S. at 570

("Here, in contrast, we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.").

"A complaint asserting securities fraud must also satisfy the heightened pleading requirement of Federal Rule of Procedure 9(b)," *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001), which mandates that plaintiffs, "[i]n alleging fraud or mistake, . . . must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). *See also Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000) ("It is well-settled in this Circuit that a complaint alleging securities fraud must satisfy the pleading requirements of 9(b) of the Federal Rules of Civil Procedure."). However, "[m]alice, intent, knowledge and other conditions of a person's mind may be averred generally." Fed. R. Civ. P. 9(b). More specifically, this rule requires that a plaintiff "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quotations omitted).

In the context of Rule 10b-5, the PSLRA also demands particularized allegations on the part of plaintiffs. To state a claim under section 10(b) and Rule 10b-5, a plaintiff must plead that: (1) the defendant made a false statement or material omission; (2) the defendant did so with scienter, characterized as "an intent to deceive, manipulate[,] or defraud"; and (3) the plaintiff relied on the statement or omission, which in turn caused the plaintiff injury. *Kalnit*, 264 F.3d at 138 (quotations omitted). Additionally, the PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *In re Scottish*, 524 F. Supp. 2d at 383 (quotations omitted). Such an inference of

scienter must be "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). However, the inference "need not . . . be 'irrefutable, *i.e.*, of the smoking-gun genre.'" *In re Scottish*, 524 F. Supp. 2d at 383 (quoting *Tellabs*, 551 U.S. at 324) (internal quotations omitted)). "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference." *Tellabs*, 551 U.S. at 326.

Plaintiffs may allege scienter by *either* (1) showing the defendants' motive and opportunity to perpetrate fraud, *or* (2) alleging "strong circumstantial evidence of conscious misbehavior or recklessness." *In re Scottish*, 524 F. Supp. 2d at 384 (quotations omitted); *see also ATSI Comm., Inc.*, 493 F.3d at 99 (discussing the PSLRA's rigorous pleading standards). In order to adequately plead motive, plaintiffs are required to "assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit*, 264 F.3d at 139. For example, whereas the general desire for a corporation to appear profitable or "to keep stock prices high to increase officer compensation," would constitute *insufficient* motives under this standard, courts have held as sufficient a pleading that "defendants misrepresented corporate performance to inflate stock prices while they sold their own shares." *Id.*

Where a plaintiff fails to adequately plead motive and opportunity, the complaint may nevertheless state a claim where there is "strong circumstantial evidence of defendants' conscious misbehavior or recklessness." *Id.* at 142 (internal quotations omitted). Reckless conduct arising to this level must be behavior that is "'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant

must have been aware of it.'" *Id.* (quoting *Honeyman v. Hoyt (In Re Carter–Wallace, Inc. Sec. Litig.)*, 220 F.3d 36, 39 (2d Cir. 2000)). In the case of securities fraud, the Second Circuit has noted on multiple occasions that plaintiffs' allegations "suffice[] to state a claim based on recklessness when they . . . specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements." *Id.* (citing *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).

With respect to "auditor scienter" in particular, the standard is "demanding." *In re Scottish*, 524 F. Supp. 2d at 385 (quoting *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 657 (S.D.N.Y. 2007)). In fact, an accountant's "alleged misconduct must 'approximate an actual intent to aid in the fraud being perpetrated by the audited company.'" *Id.* (same) (internal quotations omitted). However, courts will infer fraudulent intent "where there is evidence that the defendant remained willfully blind to the truth." *In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239, 1256 (S.D.N.Y. 1996).

Where a plaintiff alleges "red flags," constituting indicators of fraud that would put an auditor on notice of illegal activity, courts must examine such red flags in the "aggregate," which prevents defendants from "secur[ing] dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder." *In re Refco*, 503 F. Supp. 2d at 658 (internal quotations omitted). Moreover, while blanket allegations of GAAS or GAAP violations will *not alone* suffice to state a claim of securities fraud, such claims together with various red flags "are sufficient to support a strong inference of scienter." *In re Scottish*, 524 F. Supp. 2d at 385; *see also In re Philip Serv. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 475 (S.D.N.Y. 2004) ("[M]ultiple allegations of 'red flags,' considered in the aggregate, support an inference of fraudulent intent adequate to survive a motion to dismiss. '[B]ecause the 'red flags' would be

clearly evident to any auditor performing its duties, one could reasonably conclude that [Deloitte] must have noticed the 'red flags,' but deliberately chose to disregard them to avoid antagonizing [Philip] and incidentally frustrating its fraudulent scheme.'" (quoting *In re Leslie Fay Cos. Sec. Litig.*, 871 F. Supp. 686, 699 (S.D.N.Y. 1995))).

Notably, if an auditor is "not aware of facts indicating that a transaction was suspicious, or part of a fraud, the auditor's failure to investigate the transaction—even if negligent—does not provide a basis for a fraud claim." *In re CBI Holding Co., Inc.*, 419 B.R. 553, 566-67 (S.D.N.Y. 2009). In the context of red flags, courts have also noted that an auditor's access "to the information by which it could have discovered the fraud is not sufficient" to establish recklessness. In other words, auditor *access* is not tantamount to auditor *awareness*. *In re Tremont Sec. Law, State Law & Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010) (citing *In re aaiPharma, Inc., Securities Litig.*, 521 F. Supp. 2d 507, 513-14 (E.D.N.C. 2007) ("For example, merely because a person has broad access to every book in a library does not mean that the person has read and chosen to ignore facts contained in a particular book in the library. Merely alleging that E & Y had broad access to aaiPharma's operations at best supports an inference that E & Y was negligent, and more likely supports nothing at all.")).

**B.  IPERS' Securities Claims**

From the Complaint, it is clear that IPERS alleges that the reason D&T was unaware of the massive fraud associated with Walsh and Greenwood's entities is due to the fact that its "audit procedures . . . were (contrary to the claims in [its] reports) so substandard that the auditors would have to have known they were sub-standard." *In re Refco*, 503 F. Supp. 2d at 658. As noted *supra*, this recklessness-based standard is demanding, even at the pleadings stage, as a plaintiff's allegations must support a strong, plausible inference of scienter.

D&T argues that (1) IPERS has not alleged scienter with sufficient particularity to state a securities fraud claim; and alternatively, (2) IPERS has failed to adequately plead a false statement, thus precluding its § 10(b) claim. It is undeniable that plaintiffs alleging auditor scienter and securities fraud face an uphill battle, given the particularity with which they must plead such claims. However, courts must nevertheless be mindful that they "should not demand a level of specificity in fraud pleadings that can only be achieved through discovery." *Liberty Ridge LLC v. RealTech Sys. Corp.,* 173 F.Supp.2d 129, 137 (S.D.N.Y. 2001).

### 1.    Scienter

In order to state a claim pursuant to § 10(b) and Rule 10b-5, a plaintiff must allege facts from which a plausible inference could be drawn that the defendant possessed an "intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319. A plaintiff may adequately allege this requisite scienter by either: (1) stating facts that reveal that the defendant had motive *and* opportunity to commit the fraud at hand; or "(2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996); *see also Ganino*, 228 F.3d at 169 (noting that the PSLRA did not eliminate plaintiffs' ability to plead scienter via either motive and opportunity or recklessness).  Each is addressed in turn.

### a.    Motive and Opportunity

"Sufficient motive allegations 'entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" *Kalnit*, 264 F.3d at 139 (quoting *Novak*, 216 F.3d at 307) (internal quotations omitted). Thus, motives "generally possessed" by all in a similar situation will not suffice to state scienter. *Id.* Rather, the motives must be discrete, individualized, and particular. Among the types of motives that courts have

held insufficient are "the desire for the corporation to appear profitable" and "the desire to keep stock prices high to increase officer compensation." *Id.* For example, in the auditor context, the "mere receipt of compensation and the maintenance of a profitable professional business relationship for auditing services does not constitute a sufficient motive for purposes of pleading scienter." *Zucker v. Sasaki*, 963 F. Supp. 301, 308 (S.D.N.Y. 1997).

In its Complaint, IPERS does not allege any motive or opportunity on the part of D&T, choosing instead to anchor its scienter allegations in Defendant's purported recklessness. Thus, since a general desire to maintain a profitable business relationship will not, by itself, support a motive to defraud, and since Plaintiff alleges no specific, concrete motive on the part of D&T, the Complaint fails to allege scienter under the "motive and opportunity" prong.  While IPERS does address motive in its Opposition Brief (*see* Plaintiff's Opp. at 16), such allegations (1) were not addressed in the Complaint and (2) are conclusory at best (*id.* ("If D&T had made any inquiry during the course of any of its seven 'audits' that might have led to the exposure of the fraud, Walsh and Green [sic] would doubtless have fired D&T.")) There is simply no plausible basis for IPERS' claim that D&T was motivated to commit securities fraud due to a fear of recrimination. Accordingly, if IPERS' Complaint is to survive, it must do so on the basis of a recklessness theory of scienter.

### b.     **Recklessness**

Recklessness in the securities fraud context is far "more than a misapplication of accounting principles." *S.E.C. v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992). Instead, recklessness requires "accounting practices [that] were so deficient that the audit amounted to no audit at all," meaning "an egregious refusal to see the obvious, or to investigate the doubtful." *Id.* (internal citations and quotations omitted). In other words, in order to be

14

reckless in this sense, an auditor's behavior must not only "approximate an actual intent to aid in the fraud being perpetrated by the audited company," *S. Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 110 (2d Cir. 2009), but also must reflect accounting judgments that "no reasonable accountant would have made . . . if confronted with the same facts." *Price Waterhouse*, 797 F. Supp. at 1240.

At the pleading stage, the reckless conduct alleged by plaintiffs must be, "at a minimum, 'highly unreasonable[,] . . . represent[ing] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 449 (S.D.N.Y. 2008) (quoting *In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)). In the Second Circuit, strong indicators of recklessness can constitute "factual allegations indicating that defendants (1) possessed knowledge of facts or access to information contradicting their public statements or (2) failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Id.* (internal quotations omitted).

A crucial limitation to this recklessness-based scienter is the insufficiency of allegations of "fraud by hindsight." *Novak*, 216 F.3d at 309. Additionally, "there are limits to the scope of liability for failure adequately to monitor the allegedly fraudulent behavior of others." *Id.*

While the pleading of accounting violations alone will not suffice to state the scienter necessary for a 10b-5 claim, such violations, coupled with "red flags" ignored by a defendant *may* indeed give rise to recklessness tantamount to "conscious misbehavior." *See, e.g.*, *Tremont*, 703 F. Supp. 2d at 371 ("A complaint might reach the 'no audit at all' threshold by alleging that the auditor disregarded specific 'red flags' that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors.").

15

Here, IPERS alleges several such "red flags," which it contends are sufficient indications that D&T recklessly disregarded egregious signs of Walsh and Greenwood's fraud. First, IPERS claims that the ease with which the SEC discovered the Westridge fraud in 2009 itself reveals the carelessness of D&T's audit, as D&T failed to learn of the fraud in the course of its duties. (Compl. at ¶ 50(a)-(d).) Second, IPERS argues that the structural characteristics of WGTC and WGTI constituted a "classic Ponzi scheme," which D&T should have recognized. (*Id.* at ¶ 50(e), (f), (j).) Third, Plaintiff contends that WGTC and WGTI were "financially inseparable" and suspicious movements of assets between the two should have alerted D&T to the fraud. (*Id.* at ¶ 50(f), (g), (j), (p).) Fourth, IPERS alleges that WGTC and WGTI paid employee advancements and recorded the payments as receivables due from Greenwood and Walsh rather than increases of WGTI's investment in WGTC. (Plaintiff's Opp. at 7.) And fifth, Plaintiff claims that WGTI recorded management and performance fees, charged to other limited partners, as income, and consequently, as increases in its investment in WGTC. (*Id.* at 8.)

### *SEC Discovery of the Fraud*

In its motion to dismiss, Defendant argues that the discovery of fraud by the SEC does not, "on its own terms," suffice to support an "inference of scienter on the part of D&T." (Def.'s Memo. at 15.) This Court agrees. While the eventual discovery of fraud by a regulatory agency certainly provides valuable evidence as to the nature and extent of the illegal activity present within the Walsh and Greenwood entities, it does not constitute evidence that D&T noticed fraudulent activity and chose to ignore it. The SEC may indeed have found the fraud easily discoverable (*see* Compl. at ¶ 50(a)), but this fact does not necessarily reflect recklessness on the part of D&T. To assume that since the SEC, when it examined both WGTC and WGTI, found evidence of a Ponzi scheme, so too should have D&T, when auditing WGTC's financials,

discovered and reported the fraud, is to lean heavily on the correlative power of hindsight. And in the context of 10b-5, courts have repeatedly stated that corporate officers are not expected to be "clairvoyant." *In re Scottish*, 524 F. Supp. 2d at 384.

The results of the SEC's investigation reveal that Walsh and Greenwood were indeed the perpetrators of a Ponzi scheme and defrauded their investors of millions—no more, no less. Importantly, the SEC's investigation was prompted by suspicious activity at WGTI, together with WGTI's refusal to submit to an audit, rather than by irregularities at WGTC.  Plaintiff's suggestion that the SEC investigation necessarily reveals D&T's mindset rests on a *post hoc ergo propter hoc* approach to the complex issue of scienter.

Perhaps more significance to the SEC's findings of wrongdoing in the scienter context if the SEC had stated in its investigative report that WGTC's books had reflected various irregularities that would have been visible to any auditor examining them. However, the report makes no such finding. Instead, the report states that examiners at the SEC's Los Angeles Regional Office ("LARO") investigating WCM in 2005 failed to follow up on "red flags," associated with both WCM and WGTC. (Declaration of Frank B. Vanker, Dkt No. 22 ("Vanker Decl."), Report of Investigation No. OIG-533, Ex. A at 4, 10-11.)

Notably, the specific "red flags" cited in the report, which were erroneously ignored by LARO's examiners in 2005, and helped keep the fraud secret for years, were indicators associated with *WCM*'s operations. (*Id.* at 9.) According to the SEC report, WCM, as the investment advisor arm of the fraud, was operated in such a suspicious manner that it necessitated both increased scrutiny and follow-up examination of the other Westridge entities. However, LARO, due to internal corruption, failed to do either. (*Id.*) The report does not allege that WGTC alone possessed irregularities within its structure or accounting, and instead, lists

17

myriad suspicious factors associated with WCM, including, but not limited to, its "poor compliance culture," inaccuracies in its Form ADV, misleading marketing materials, and its ability to access client assets held by [WGTC]. (*Id.* at 9-10.)

While the 2005 LARO team also found irregularities in WGTC, enough to justify a referral to the Boston Regional Office ("BRO") (*id.* at 10-11), the 2009 fraud discovery involved a "joint investigation of [WCM] and [WGTC]," rather than a single analysis of WGTC's records alone, as Plaintiff suggests. (*Id.* at 11.) The SEC report does not state that the fraud was easily discoverable from an examination of WGTC. Rather, it highlights the irregularities discovered by a *comparison* between WCM and WGTC's books. (*See id.* at 12) ("[A]ll you really had to do was look at the amount of net assets that were on [WCM's] books, compare that with the amount of money that [WGTC] was representing that they were managing, and those amounts just didn't tie out.")

Though the analysis performed by the 2009 SEC team to uncover the fraud was undisputedly "simple," it is not clear from the report that D&T's audit of WGTC was deficient because it failed to uncover the nefarious scheme. As Defendant points out, IPERS does not allege that D&T reviewed, or had the opportunity to review, WCM's books. (Def.'s Memo. at 16; Compl. at ¶ 50(c).) Instead, IPERS asserts that WGTC "*should have* reviewed Westridge's books" (Def.'s Memo. at 16 (emphasis in original)), alleging in its complaint that if D&T had performed a "simple analysis," akin to the comparison employed by the SEC during its 2009 investigation, it too would have "easily" and "immediately" discovered Walsh and Greenwood's scheme. (Compl. at ¶ 50(c).) Again, to allege—couched in the terms of a negligence rather than a recklessness standard—that, since the SEC discovered the fraud, D&T too should have done so, fails to  support the "conscious misbehavior" required for a particularized scienter pleading.

### *Specific Transactions and Red Flags*

The crux of IPERS' claim is that, in the course of its audit, D&T had access to, and disregarded, "specific red flags" that would have alerted it to the fraud that was afoot. Essentially, IPERS alleges that irregularities in WGTC's books, which D&T undisputedly saw during its audit, would have alerted any reasonable auditor in D&T's position to the possibility of fraud and, correspondingly, to the need to examine WCM's records as well, comparing them to WGTC's own books. (*Id.* at ¶ 50(c), (d), (e).)

The standard articulated in the PSLRA is a demanding one. It is not enough that D&T *should* have examined WCM's books, or *should* have probed more forcefully into the relationship between WGTC and the associated, fraudulent pass-through vehicles controlled by Walsh and Greenwood. *See O'Brien v. Nat'l Property Analysts Partners*, 719 F. Supp. 222, 228 (S.D.N.Y. 1989) ("[A] purported failure to investigate [does] not rise above the level of negligence, which is legally insufficient." (internal quotations omitted)). Instead, IPERS' claim may survive only if *no reasonable auditor*, with access to the type of information present in WGTC's books and records, would have made the decision to issue a clean audit report. *See In re Scottish*, 524 F. Supp. 2d at 385 ("[A plaintiff must allege] that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.").

Accordingly, it is necessary to examine the "red flags" alleged by IPERS to determine whether Plaintiff has alleged with sufficient particularity the types of fraud indicators that courts have determined could not be ignored absent recklessness. *See Tabor*, 579 F. Supp. 2d at 449. Specifically, IPERS must adequately allege that D&T either "(1) possessed knowledge of facts or access to information contradicting their public statements or (2) failed to review or check

information that they had a duty to monitor, or ignored obvious signs of fraud." *Id.* (quotations omitted).

IPERS' allegations of red flags, though perhaps sufficient to give rise to a negligence claim against D&T, do not support a recklessness indicative of conscious indifference. Moreover, many of the supposed red flags are related to WGTI's, rather than WGTC's, books, and WGTI—though integral to Walsh and Greenwood's fraud—was an unregistered, unaudited entity and was not D&T's client.

IPERS asserts that there were many suspicious movements of funds between WGTC and WGTI, which should have alerted D&T—or would have alerted any reasonable auditor in its position—to the fraudulent activity occurring within the Westridge entities. However, the Court agrees with D&T that IPERS fails to allege these red flags with sufficient particularity. First, as to the allegation of the three separate months in which WGTC's books showed that WGTC was investing in WGTI—an inappropriate "flip" of the investor relationship (Compl. at ¶ 50(p)(v))—IPERS does not plead (1) in which three months, during a period of time constituting over a decade, WGTC's books revealed this relationship; (2) why this relationship is necessarily indicative of fraud; (3) whether D&T even had access to the records from the unspecified years in which this occurred; and (4) how, even if D&T had seen this relationship in its audit, ignoring it would have constituted conscious misbehavior. (Defendant's Reply Memorandum (Def.'s Rep.), Dkt No. 26, at 5.)

Second, none of IPERS' general allegations concerning the suspicious movement of funds between WGTI and WGTC (*see, e.g.*, Compl. at ¶ 50(j)) give rise to an inference that D&T possessed any awareness as to the Walsh-Greenwood fraud, nor does Plaintiff allege with particularity how D&T specifically failed in its auditing duties with respect to WGTC's books.

Instead, the Complaint focuses on broad-based allegations of movements of funds between WGTI and WGTC, claiming that these unspecified transactions somehow reflected the presence of fraudulent activity. (*See, e.g.*, *id.* at ¶ 50(p) ("The books and records of WGTC reflect numerous transactions involving the movement of funds back and forth between WGTC and WGTI. This movement would have been visible to Deloitte as a result of its examination of the books and records of WGTC.").)

Even presuming that IPERS had alleged, with specificity, the time periods and particularized transactions involving the movement of certain funds between WGTC and WGTI, the mere pleading of fund movement is not enough. To survive Defendant's motion, IPERS would have had to allege the movement with particularity, show that D&T had access to the pertinent records at the stated time, and plead a compelling inference of recklessness associated with D&T's decision to view the transactions and nevertheless issue a clean opinion after the fact. In other words, a successful pleading on this front would have not only alleged that D&T had access to a certain set of information, but also explained the circumstances that would make an auditor in D&T's position reckless to ignore the clear implications of fraud suggested by such circumstances. *See In re CBI*, 419 B.R. at 567 ("Where an auditor was not aware of facts indicating that a transaction was suspicious or part of a fraud, the auditor's failure to investigate the transaction—even if negligent—does not provide a basis for a fraud claim.").

Moreover, it is not clear from IPERS' Complaint that any of these aforementioned transactions would have even been visible to D&T in the relevant years (2005-2007) in WGTC's books. In fact, many of IPERS' alleged red flags seem to be transactions that would only have been evidenced, if at all, in WGTI's, or even WCM's, books. (*See, e.g.*, Plaintiff's Opp. at 7.) For example, IPERS alleges: "WGTI paid employee advances directly to or for Greenwood and

Walsh, and recorded the payments as receivables due . . . instead of as increases of its investment in WGTC;" "WGTI made no entries regarding its transfers of bank interest income to WGTC between June 30, 2006 and December 31, 2008, while WGTC recorded these receipts from WGTI as income;" and "WCM sent monthly Summaries of Investment Portfolio to each investor," which told investors that the statement reflected investors' capital in WGTC, "whether or not the investment was a direct limited partnership interest with WGTC or an indirect investment through a note or stockownership in another Westridge fund controlled by Walsh and Greenwood." (*Id.* at 7-8.)

None of these red flags would ever have been apparent in WGTC's statements or records, nor through a comparison of the various entities, but rather, would only have been available to D&T through an examination of WCM or WGTI. Such an examination was not only not required, but D&T, as a matter of law, cannot be held accountable for red flags or representations in statements of unaudited, non-client entities. *See, e.g.*, *In re Tremont*, 703 F. Supp. 2d at 371 ("The notion that a firm hired to audit the financial statements of one client (the Rye Funds and the Market Neutral Fund) must conduct audit procedures on a third party that is not an audit client (BMIS) on whose financial statements the audit firm expresses no opinion has no basis. To impose liability on the Auditors would expand their limited, circumscribed duty impermissibly. Accordingly, plaintiffs' Section 10(b) claim against the Auditors is dismissed.").

The most specific of D&T's allegations relate to (1) employee advances made by WGTC to Walsh, Greenwood, and James Carder, which were allegedly present in the books and records of WGTC; and (2) the allocation of expenses and performance fees to the Westridge businesses' limited partners. (Compl. at ¶ 50(j)(ix); (p)(i).) With respect to the employee advances, IPERS alleges that employee advances that WGTC paid to Greenwood, Walsh, and James Carder were

recorded by WGTI as receivables, or, in the case of Carder, "expensed to WGTI as professional fees." (Plaintiff's Opp. at 7.) Again, while this classification may be true, it is unclear how these allegations would have affected WGTC's financial statements or records. In fact, in its Complaint, IPERS states that due to this accounting practice, "WGTC's books did not carry any asset or expense item in connection with its payments to Greenwood and Walsh and therefore its books were 'clean' for the auditors to examine." (Compl. at ¶ 50(j)(ix).) If WGTC's books were indeed clean, then D&T could not have been expected to discover the mischaracterization of employee advances as receivables. What is more, IPERS again fails to "allege in what years any such advances were made or that any were made during the relevant 2005-2007 audit years." (Def.'s Rep. at 6.)

As for the professional fee allocation, it is true that IPERS does allege with particularity that WGTC's 2007 records failed to reveal the allocation of a $1,174,209 performance fee as net income to the two managing general partners, but rather, characterize the fee as an allocation of net income to WGTI. According to IPERS, this allocation caused the performance fee to avoid its proper characterization as personal income of Greenwood and Walsh (Compl. at ¶ 50(p)(i)), which Plaintiff contends "would have been recognized by any competent auditor as evidence of tax evasion." (*Id.*)

Even taking as true the allegations that this particular allocation evidences tax evasion, and was visible within WGTC's books and records, the question is not whether a competent auditor would have—and consequently, whether D&T should have—recognized the characterization as tax evasion. The relevant inquiry is instead whether this pleading is suggestive of recklessness on the part of D&T with respect to the fraud.  At most, the misallocation of this performance fee, during a single relevant year, constitutes evidence of tax

evasion, and does not necessarily support an inference that D&T consciously disregarded a Ponzi scheme of massive proportions.

D&T presumably should have noticed this alleged misallocation, and it is likely negligent for an auditor to fail to discover such an evasive reporting technique, with its clear tax implications. However, as one of the only red flags alleged with sufficient particularity, this allegation alone is insufficient to raise a plausible inference of the type of recklessness required by § 10(b) and Rule 10b-5. IPERS is correct in its assertion that courts should view red flags in the aggregate, rather than in a vacuum. *See In re Refco*, 503 F. Supp. 2d at 658 ("[T]he red flags must be viewed in the aggregate; defendants 'cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder.'" (quoting *In re Philip*, 383 F. Supp. 2d at 476)). However, where all but one or two of the alleged red flags are without sufficient particularity, the likelihood that any one disregarded transaction will serve as a basis for recklessness-based scienter diminishes greatly, because recklessness, by its very definition, requires the kind of "egregious refusal to see the obvious" indicative of "conscious misbehavior," rather than mere negligence. *In re Tremont*, 703 F. Supp. 2d at 370.

The case law from the Second Circuit supports the conclusion that IPERS has, at most, pleaded that D&T was negligent, engaging in a "shoddy" audit and overlooking some indicators that would have perhaps caused a reasonable auditor to question the soundness of its client's operations. *See, e.g.*, *id.* at 371 ("Alleging a shoddy audit in violation of GAAS does not establish the intent to defraud required to maintain a claim for securities fraud. And while plaintiffs identify several purported 'red flags' in the Complaint, they do not allege that the Auditors were aware of any facts indicative of Madoff's fraud that they consciously disregarded—plaintiffs do not allege that Markopolos ever discussed his assessment that Madoff

24

was operating a Ponzi scheme with the Auditors or published it in the press, plaintiffs do not assert that the Auditors knew that Madoff s returns could not be replicated by others, and plaintiffs do not claim that investors who elected not to deal with Madoff informed the Auditors of their decisions.").

To bolster its case, Plaintiff cites *In re Bear Stearns*, 763 F. Supp. 2d 423 (S.D.N.Y. 2011), where investors brought a class action suit against the bank, its officers and directors, and D&T, alleging violations of, *inter alia*, the federal securities laws. In that case, D&T moved to dismiss the securities complaint, *id.* at 511, claiming that the investors had failed to adequately plead scienter. *Id.* at 518. The court denied D&T's motion, holding that Plaintiffs' specific allegations of red flags, together with GAAP/GAAS violations, were sufficient to survive the motion to dismiss stage. *See id.* ("The key distinction between cases relating to hindsight and the allegations here is that multiple GAAP and GAAS violations have been described and red flags alleged."). The critical difference between the instant case and *In re Bear Stearns* is reflected in the specificity of the complaints' respective allegations. The *Bear Stearns* complaint contained "specific facts underlying its alleged GAAS violation." *Id.* at 511. For example, it alleged that GAAS required D&T to "'test Bear Stearns' processes' for establishing the fair value of its assets and that, in doing this testing 'Deloitte was confronted with significant red flags' because, '[a]ccording to the 2008 OIG Report,' 'Bear Stearns failed to include crucial factors in its valuation models including, for example, inadequate consideration of default risk and scenarios of home price depreciation.'" *Id.* at 512. The *Bear Stearns* complaint then went on to allege that D&T did not perform specific procedures necessary to assess "internal controls over financial reporting of the fair value of financial instruments," and also cited which specific accounting standards required this type of fair value reporting. *Id.*

Additionally, the *Bear Stearns* complaint noted that the bank's "Level 3 assets grew from 11% of its total financial assets in the fourth quarter of 2006 to 29% by the first quarter of [2008]," meaning that it was "vulnerable and exposed to additional industry-specific fraud risk factors and audit risks." *Id.* at 513. Tellingly, the complaint went on to allege that D&T was "required to consider" these specific vulnerabilities "as part of its audit of Bear Stearns' financial statements." *Id.* The investors' allegations did not stop there, including several examples of those risk factors, including "the estimation of the fair value of investments (AU316.39); the risk of transactions with related parties that do not have the substances or the financial strength to support a transaction without assistance from the entity under audit (AU316.67); the risk of management overriding internal controls (AU 316.08. 42, and 57-65); the risk that new regulatory requirements, such as the recently implemented CSE structure, may cause an incentive or pressure for fraudulent financial reporting (AU 316.95, A.2.a)"; and the list goes on. *Id.* (internal citations omitted)). The *Bear Stearns* court, examining these and other particularized allegations of D&T's failure to comply with GAAS and GAAP, along with other red flags, denied the motion to dismiss.[3]

The difference between the *Bear Stearns* complaint and IPERS' allegations in the instant case is significant. Whereas the former listed over a dozen failures on the part of D&T in its audit procedures, *see, e.g.*, *id.* at 514-15, along with specific consequences and red flags that created a strong inference that the auditing failures were far more than "innocent and unintentional," *id.* at 518, IPERS' Complaint contains no similar allegations.  For example, IPERS alleges that D&T violated four separate accounting standards. (Compl. at ¶ 40(q)(i)-(iv).)

---

[3] Some of the alleged red flags included the collapse of related hedge funds, which D&T also audited, and the widespread industry warnings concerning the subprime market. *Id.* at 517.

But, in these allegations, Plaintiff does no more than "*conclude*[] that D&T did not comply with certain GAAS provisions adopted by the [PCAOB]." (Def.'s Memo. at 8. (emphasis in original.)) In contrast to *In re Bear Stearns*, IPERS' Complaint provides no accompanying factual allegations concerning the types of deficiencies present in D&T's audit, the consequences of those deficiencies, and the way in which those deficiencies specifically departed from the cited accounting standards.[4]

Similarly, other cases cited by Plaintiff, in which courts in this circuit have denied auditors' motions to dismiss plaintiffs' securities fraud complaints, are distinguishable from IPERS' allegations here. For example, in *In re Refco*, "large receivables at the end of financial reporting periods" simply "appeared" or "disappeared." 503 F. Supp. 2d at 659. The court noted that such "large transactions near the end of financial reporting periods can be a significant red flag," adding that the "size of the transactions" and "the volume of documentation allegedly created" by these events, together with both the "suspicious timing, recurrent pattern, and unusual nature of the related-party transactions," and "the large size of . . . sham loans in comparison to Refco's net income" supported a "strong inference of scienter on [the auditor's] part." *Id.* at 658-60.

While the *Refco* court was skeptical of many of the plaintiffs' allegations, noting that they failed to explain the actual repercussions of the auditor's failure to confirm the substance of related-party transactions, *id.* at 658-59, it ultimately agreed that scienter had been plausibly

---

[4] As noted by Defendant, the accounting standards cited by Plaintiff are far from specific in nature. General Standard No. 3, "broadly requires the exercise of due care," and AU § 230, which deals with due care "addresses [it] in more than a dozen subparts." AU § 316 and AU § 334—also cited by Plaintiff—are respectively titled "Consideration of Fraud in a Financial Statement Audit" and "Related Parties," and  together have 95 subparts. But IPERS fails to cite specific provisions of any of these auditing standards "or [to] explain how or why D&T violated one or more of these provisions." (Def.'s Rep. at 2 n.1.)

alleged due to the auditor's utter "lack of interest in large receivables that briefly disappeared from Refco's books at the moment when they would have been reportable." *Id.* at 659. This Court agrees that these types of receivables constitute an existing red flag that would be both highly visible and highly suspicious to any reasonable auditor. However, no such transaction is alleged here. Moreover, the *Refco* Complaint specifically alleged that the fraud was "documented in plain terms in numerous documents maintained at the Company," actually specifying the documents to which it referred. *Id.*

IPERS does not allege recklessness with the specificity of the *Refco* plaintiffs. Instead of something akin to the large, disappearing receivables, IPERS alleges unspecified, generalized, suspicious movements of funds between WGTI and WGTC, which it claims were indicative of fraud. With the exception of the income tax evasion claim, IPERS fails to plead which specific transactions were suspicious, why they were so, and where in the WGTC books or records such transactions were visible to D&T. Instead, IPERS avers most of its allegations generally, asserting that to view them in the aggregate is to observe information that no reasonable auditor could have ignored. However, aggregation itself cannot cure the generality of each, individual allegation. *See Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 578 (S.D.N.Y. 2011) ("[I]t makes no sense to say that a defendant has seen red flags he has not seen merely because he has not seen three of them."); *see also* Def.'s Rep. at 6 n.3.

Plaintiff also cites *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192 (S.D.N.Y. 2004), and *In re IMAX Secs. Litig.*, 587 F. Supp. 2d 471 (S.D.N.Y. 2008), to further support its claim that red flags, "when coupled with allegations of GAAP and GAAS violations, are sufficient to support a strong inference of scienter." (Plaintiff's Opp. at 15.) However, these cases are inapposite here, and also, readily distinguishable. The *AOL* complaint,

much like that in *Refco*, explained with particularity that Ernst & Young—the auditors—"ignored the fact that material amounts of advertising revenue came in at the end of each quarter just in time to permit [Defendant] to hit its advertising revenue targets." *In re AOL*, 381 F. Supp. 2d at 240. The *AOL* court noted that there is precedent for finding "late-in-the-quarter revenue recognition [as] sufficient to support a claim of scienter." *Id.* Moreover, the *AOL* complaint also alleged that Ernst & Young "ignored several of AOL and AOLTW's complex barter transactions that generated gains or earnings growth while the amounts of cash transacted were simply exchanges of like amounts." *Id.* These transactions were specifically alleged, large in magnitude, and related to the "critical role that advertising revenue played in AOL and AOLTW's ability to meet its earnings targets." *Id.*

Here, IPERS does not allege any red flag of similar magnitude or import. Moreover, while the suspicious movement of funds between WGTI and WGTC may very well have been integral to the continuation of Walsh and Greenwood's fraud, there is simply no allegation that supports an inference that D&T was aware—or recklessly ignored—the existence of specific, named transactions. For the *AOL* court, like the court in *Refco*, the magnitude and specificity of the transactions, coupled with specific and numerous GAAS and GAAP violations, were "sufficient to support an inference of scienter"; not so here. *Id.*

Finally, Plaintiff's invocation of *In re IMAX* also fails to persuade this Court that its claims against D&T should survive. In *In re IMAX*, investors brought securities fraud class actions against IMAX, its officers, and its auditor, alleging artificial stock price inflation. *See generally* 587 F. Supp. 2d 471. The *IMAX* complaint alleged that the behavior of IMAX's auditor, PricewaterhouseCoopers ("PWC"), satisfied § 10(b)'s scienter requirement because: (1) "PWC violated GAAP and Generally Accepted Auditing Standards;" (2) "PWC had unfettered

access to internal IMAX reports and press releases containing detailed information regarding the progress of theater system installations;" and (3) "IMAX's approach to revenue recognition was an ongoing subject of review by PWC, and PWC provided *advice to management with respect to revenue recognition for theater systems*." *In re IMAX*, 587 F. Supp. 2d at 484 (internal quotations and footnotes omitted) (emphasis added). However, the court found this last factor alone to be most dispositive. *Id.*

Defendant is correct in distinguishing *In re IMAX* on these grounds. (*See* Def.'s Rep. at 8.) PWC was not merely an outside auditor with access to IMAX's books and records. Instead, PWC was "extensively involved in the process by which IMAX's revenue recognition policy developed and evolved during the class period." *In re IMAX*, 587 F. Supp. 2d at 484. Far from being an outside auditor engaged in producing opinions on the soundness of a company's financial statements, to IMAX, PWC was much more. *See id.* at 484-85 ("PWC was regularly consulted by IMAX management and accounting issues and financial statements were always reviewed and opinions provided by PWC before the Company's financial statements were publicly disclosed." (internal citations omitted)). Thus, unlike D&T, "PWC was not a typical outside auditor, . . . but instead was actively advising IMAX and participating in the crafting of its theater installation accounting policy—a policy that had[] . . . significant consequences for how IMAX's financial health as publicly portrayed." *Id.* at 485. Accordingly, the court found the inference of scienter plausible, despite the fact that the voluminous complaint failed to "allege that PWC actually reviewed any of the various documents tracking theater installation that could have revealed if IMAX was violating its own accounting policy." *Id.* No such inference is appropriate here, given D&T's role as a "typical outside auditor."

The *IMAX* court also noted that neither the allegations of the GAAP violations, *nor* the fact that PWC had access to the records at issue, alone would suffice to state a proper claim of recklessness-based scienter. *See id.* (comparing the *IMAX* complaint to that in *Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)), in which the court of appeals affirmed the district court's dismissal of a securities claim against the auditor on scienter grounds, noting that access to records alone does not support scienter unless it is "coupled with" "facts from which to reasonably infer that" the auditor knew of specific circumstances that made statements in those records suspicious).[5] Instead, it focused on the unique role of PWC within this particular company.

In sum, the cases cited by IPERS in support of its position are distinguishable from the facts alleged here, and do not preclude dismissal of IPERS' securities fraud claim on scienter grounds.[6]

---

[5] In *Rothman*, the Second Circuit held that recklessness-based scienter was not adequately alleged when the auditor had access to documents reporting product sales data that established that its client would "not likely recoup its royalty advances," because the sales data reports alone did not indicate this fact. 220 F.3d at 98. Instead, the court held, scienter would have been established only if the auditor had access to the sales reports *and* also knew that the majority of its client's product sales generally "occur[red] within the first year of the product's release." *Id.* Thus, since the complaint failed to allege facts "from which to reasonably infer that [the outside auditor] knew that most of GT's sales of a product occur within a year of the product's release," the district court was correct in dismissing the case. *Id.*

[6] Two recent cases in this district have underscored the difficulty of adequately alleging auditor scienter. In *In re Longtop Financial Tec. Lim. Sec. Litig.*, No. 11 Civ. 3658, 2012 WL 5512176 (S.D.N.Y. Nov. 14, 2012), lead plaintiffs Danske Invest Management A/S and Pension Funds of Local No. One alleged violations of Section 10(b) and Rule 10b-5 against, among others, auditor Deloitte Touche Tohmatsu CPA Ltd ("DTTC"). As IPERS has here, the *Longtop* plaintiffs alleged that DTTC violated various provisions of GAAS and GAAP. *Id.* at *3. Additionally, the plaintiffs claimed that a "perfunctory review" on the part of DTTC would have revealed six, specific "red flags" indicating fraud. *Id.* Judge Scheindlin dismissed the complaint, noting that the plaintiffs had failed to meet the *Tellabs* pleading standard for scienter. *Id.* at *9 ("At bottom, the Complaint alleges fraud by hindsight, a claim that is accorded the same respect in this Circuit today as it was when Judge Friendly gave it a name. Fraud is always obvious in retrospect, but it

###### 2.    False Statement

The parties also disagree as to the adequacy of IPERS' allegations that (1) D&T made several false statements associated with its audit reports and (2) WGTC materially misstated its financial records. The gravamen of IPERS' claim that there were indeed false statements made by D&T, relates to the quality of the audit itself, namely, that D&T's statements in its audit reports were false because a proper audit would have led D&T to swiftly uncover the fact that WGTC was the legitimate front of a classic Ponzi scheme. (Plaintiff's Brief in Opposition ("Plaintiff's Opp."), at 10.)

Having already determined that Plaintiff has not adequately pleaded scienter, it is unnecessary to reach the complex issue of whether IPERS alleged, with sufficient particularity, the falsity of WGTC's financials and D&T's reports. Without a false statement, or material omission, of course, there can be no securities fraud. However, even if Plaintiff had adequately alleged a material misstatement or omission, the deficiency of its scienter pleading nevertheless would still mandate the dismissal of its securities claim. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008) ("In a typical § 10(b) private action a plaintiff

---

is not reckless to lack clairvoyance.  Apart from its exhaustive recitation of auditing standards and purported red flags, the Complaint does little more than allege that, had DTTC performed a better audit, Longtop's fraud would have been uncovered sooner.  Considering the allegations in the Complaint as a whole, the strongest inference is that DTTC was duped by Longtop, not that it recklessly enabled them. Accordingly, the Complaint fails to adequately plead scienter."). Similarly, in *Dobina v. Weatherford Int'l Ltd.*, No. 11 Civ. 1646, 2012 WL 5458148 (S.D.N.Y. Nov. 7, 2012), Judge Kaplan, in granting auditor Ernst and Young's motion to dismiss, underscored the "demanding" nature of auditor scienter in securities fraud cases. *Id.* at *13.  In response to alleged red flags, Judge Kaplan noted that the complaint was "replete with allegations that [E & Y] would have learned the truth as to those aspects of [Weatherford's taxes] if [E & Y] had performed the due diligence it promised," which was simply not sufficient to allege scienter.  *Id.* at *14 (alteration in original) (quotations omitted).  Moreover, the *Dobina* plaintiffs' allegations regarding GAAS compliance were "disposed easily," as nothing in the operative complaint "even beg[an] to suggest[] anything about E & Y's state of mind with regard to how it conducted the audit."  *Id.* at *15.

must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; *and* (6) loss causation." (emphasis added)).

To support an inference of recklessness-based scienter, a plaintiff must allege that an auditor knew of certain red flags, or those flags must be "so obvious that an auditor *must* have known of them." *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 416 (S.D.N.Y. 2010). The pleading standard for federal securities fraud is rigorous, and to meet it, the red flags giving rise to an inference of recklessness must be particularized, specific, and together, egregious. Here, Plaintiff has not met its burden. The more plausible inference is that at most, D&T was negligent, performing a "shoddy" audit that failed to uncover a fraudulent scheme. *Accord In re Doral Financial Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 465 (S.D.N.Y. 2008) ("Taken as a whole, [Plaintiffs'] allegations themselves suggest that PwC did not discover the fraud, not because of recklessness, but because Doral's management hid the fraud from PwC just as it did from the public at large."). However, it is axiomatic that mere negligence is insufficient to support a claim under § 10(b) and Rule 10b-5. *See id.* ("Stated a different way, the recklessness required to hold a 'non-fiduciary accountant' liable for fraud 'must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company.'" (quoting *Rothman*, 220 F.3d at 98)). Accordingly, Plaintiff's securities fraud claims must be dismissed.

### C.    Aiding and Abetting

In addition to its federal securities fraud claims, Plaintiff also asserts that D&T committed a breach of fiduciary duty. (Compl. at ¶¶ 67-76.) Here, IPERS' theory is based on the allegation that D&T aided and abetted the Walsh and Greenwood fraud through its willfully

blind, substandard audit. (Plaintiff's Opp. at 21-23.) "To establish liability for aiding and abetting fraud, a plaintiff must show (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *In re Agape Litig.*, 773 F. Supp. 2d 298, 307 (E.D.N.Y. 2011) (quotations omitted).

Here, in order to survive D&T's motion to dismiss, IPERS must plead with particularity facts that raise a strong inference that: (1) WCM owed its clients a fiduciary duty, which was breached when client funds were directed to WGTI instead of WGTIC; (2) D&T actually knew, or was willfully blind to the fact, that WCM was fraudulently directing investors' funds to WGTI, enabling Walsh and Greenwood to misappropriate said investments; and (3) D&T provided "substantial assistance to [WCM] in perpetrating, or concealing, the fraudulent scheme." (Def.'s Memo. at 23-24.) (citing *Kolbeck v. Lit Am., Inc.*, 939 F. Supp. 240, 245-47 (S.D.N.Y. 1996)).

It is true that Federal Rule of Civil procedure 9(b) allows plaintiffs to allege malice, intent, and knowledge *generally*, meaning that a "strong inference"—generated by "evidence of conscious misbehavior or recklessness"—will suffice for a *securities* fraud claim. *In re Agape*, 773 F. Supp. 2d at 308 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). However, courts have read the "actual knowledge" requirement for an aiding and abetting claim to constitute a requirement distinct from the inference permitted in the scienter context for the fraud itself. *See id.* at 308 ("The actual knowledge element of a claim for aiding and abetting is a distinct requirement from the scienter required to allege the underlying fraud.").

Thus, it is entirely possible for a plaintiff to "adequately plead under Rule 9(b) the scienter required to support an underlying fraud claim," but nevertheless fail to satisfy the

pleading requirements of his aiding and abetting claim. *Id.* Some courts have found actual knowledge under a theory of willful blindness or conscious avoidance. *Id.* at 308-09. In order to rise to this level, however, a defendant will necessarily have acted with a "culpable state of mind," meaning that to adequately state a claim a plaintiff must "plausibly allege[] that a defendant made certain decisions specifically to avoid attributable knowledge of the underlying fraudulent scheme." *Id.* at 309.

In sum, willful blindness requires proof that "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011). Willful blindness is a standard that "surpasses recklessness and negligence," meaning that a "willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.* at 2070-71.

While Plaintiffs have certainly pleaded sufficient facts to raise an irrefutable inference of the existence of fraud, they have failed to plead D&T's state of mind with sufficient particularity. For the reasons stated in the section above, the facts as alleged in the Complaint fail to support an inference that D&T was reckless, let alone willfully blind with respect to the fraud afoot at Westridge. While D&T may indeed have been negligent, the allegations do not establish that it was a conscious wrongdoer.  Accordingly, Plaintiff's aiding and abetting claims are dismissed.

### III.     Conclusion

For the foregoing reasons, Plaintiff's Complaint is DISMISSED with prejudice. The

Clerk of Court is directed to close the motion at docket entry number 20.


SO ORDERED.


Dated: New York, New York
        January 23, 2013

_____
J. PAUL OETKEN
United States District Judge