```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
IOWA PUBLIC EMPLOYEES' RETIREMENT                           :
SYSTEM,                                                     :
                                    Plaintiff,              :    12 Civ. 2136 (JPO)
                                                            :
                  -v-                                       :    OPINION AND ORDER
                                                            :
DELOITTE & TOUCHE LLP,                                      :
                                    Defendant.              :
                                                            :
------------------------------------------------------------X
```

J. PAUL OETKEN, District Judge:

Plaintiff Iowa Public Employees' Retirement System ("IPERS" or "Plaintiff") brought this action against Deloitte & Touche LLP ("D&T" or "Defendant"). IPERS' claims derive from D&T's audits of its client, registered broker-dealer WG Trading Company, LP ("WGTC"). IPERS alleges violations of § 10(b) of the Exchange Act ("the '34 Act"), pursuant to SEC Rule 10b-5, and breach of fiduciary duty, under a theory of aiding or abetting. On January 23, 2013, the Court issued an opinion granting Defendant's motion to dismiss (the "Opinion"). *See Iowa Pub. Employees' Ret. Sys. v. Deloitte & Touche LLP ("Iowa Pub.")*, 919 F. Supp. 2d 321 (S.D.N.Y. 2013). IPERS now seeks reconsideration of that dismissal and leave to file an amended Complaint. For the reasons that follow, IPERS' motion is denied.

I.   Background

   A.   Factual Background

Familiarity with the facts of this case is presumed; accordingly, the Court relates only those facts that are necessary for the disposition of this motion. WGTC, D&T's client, was a registered broker-dealer through which Paul Greenwood and Stephen Walsh perpetrated a multi-

1

million-dollar Ponzi scheme from 1996 to early 2009.  Several related entities were also involved in this fraud:  namely, Westridge Capital Management, Inc. ("WCM"), a registered investment advisor, and WG Trading Investors, L.P. ("WGTI"), an unregistered investment vehicle.  *Id.* at 326.

In its initial Opinion on D&T's motion to dismiss, the Court analyzed in detail IPERS' claims of recklessness, *id.* at 334-342, ultimately determining that IPERS, "at most, pleaded that D&T was negligent, engaging in a 'shoddy' audit and overlooking some indicators that would have perhaps caused a reasonable auditor to question the soundness of its client's operations," *id.* at 339 (citation omitted).

Seeking reconsideration, IPERS contends that the Court fundamentally misinterpreted IPERS' central theory of liability: namely, that D&T was reckless in expressing a clean opinion with respect to WGTC without auditing the interpartnership account[1] between WGTC and WGTI.  (*See* Plaintiff's Brief in Support of its Motion for Reconsideration and Reargument, Dkt. No. 33 ("Pl's Mem."), at 2.)  According to IPERS, by analyzing whether the alleged "red flags" in its original Complaint constituted indicators of *fraud*, rather than constituted indicators that either (1) WGTC (D&T's client) and WGTI were operated as a single entity, or (2) that the structural operations of WGTC and WGTI revealed "classic Ponzi scheme" elements, the Court failed to grasp the "crux" of its claims.  (*Id.* at 5-10.)  Accordingly, IPERS' principal contention in its motion for reconsideration is that there were facts apparent from the books and records of WGTC that gave rise to a duty, on behalf of D&T, to inquire further, and, by extension of that

---

[1] In referring to the "interpartnership account," IPERS apparently means the accounting mechanism and records of the "money or debits and credits going back and forth between [WGTI and WGTC]."  (*See* Transcript of Conference held 7/12/2013, Dkt. No. 39 ("Tr."), at 8:14-15; *see also id.* at 7:16-8:22.)

2

duty, the failure to conduct such an investigation constituted actionable recklessness on the part of D&T.  (Tr. at 5:3-5 ("Now, I think the focus today, though, and I think the focus of your question is on, what were the facts that gave rise to a duty to inquire further.").)  In essence, IPERS contends that the recklessness required for scienter under Rule 10b-5 and the Private Securities Litigation Reform Act (the "PSLRA") can be exhibited by an auditor that fails to discharge a duty to inquire further into suspicious activity that itself is not necessarily indicative of fraud, but instead, is indicative of a need to gather more precise information in order to complete a legitimate audit.  (*Id.* at 5:14-17.)

According to IPERS, D&T's duty to investigate further was triggered by the commingling of assets and the distribution of money from WGTC's account to WGTI investors or from WGTI investors to WGTC's accounts (*id.* at 6:14-16), together with the facts that: WGTC and WGTI shared the same system of internal controls under the same management (Pl.'s Mem. at 5); WGTC paid employee advances for Greenwood and Walsh and was reimbursed by WGTI (*id.* at 8); WGTC allocated losses to its affiliate, WGTI, while allocating income to all other investors (*id.* at 9); and, WCM prepared monthly investment summaries to investors, which included a single-page statement forwarded from the WGTC/WGTI office, and mailed that summary to each investor (*id.* at 10).  IPERS asserts that once D&T, through these indicators, realized that WGTC and WGTI were "being managed as a single unit," it was D&T's responsibility to "audit that [interpartnership] account, mak[ing] sure that these inflows and outflows [were] legitimate and [were] maintained in accordance with generally accepted accounting practices."  (Tr. at 8:4-8; *see also id.* at 9:1-6 ("[D&T] couldn't just accept the TC side of the equation.  They had to look beyond that and to audit the inter-partnership account, the back-and-forth.  And I think that would mean going beyond just looking at what it says on the

TC books and saying, OK, that's what it says on the TC books, we don't have anything further to do.").)

Additionally, IPERS contends that its Complaint "goes beyond the mere 'single entity' allegations and alleges that '[t]he operations of WGTC and WGTI, when considered as a single entity, had the elements of a classic Ponzi scheme . . . .'" (Pl.'s Mem. at 10 (quoting Complaint at ¶ 50(g)).) IPERS asserts that the Court failed to discuss these allegations, overlooking its allegation that D&T "should have recognized well known tell-tale structural characteristics that WGTC and its affiliates shared with ESM[2] and its affiliates or that otherwise suggested that WGTC was part of a Ponzi scheme." (*Id.* (quotations and citation omitted).)

Moreover, IPERS is prepared to supply an affidavit and expert proof "that there is factual evidence from the books and records of [WGTC], that they would give rise to a factual conclusion by an accounting expert that it was reckless to only look at the books of TC and not audit the inter-company account of TC and TI." (Tr. at 7:11-15; *see also* Pl.'s Mem. at 11.)

**B.     Procedural Background**

On January 23, 2013, the Court issued its Opinion and Order granting D&T's motion to dismiss. (Dkt. No. 30.) IPERS filed its Motion for Leave to file an Amended Complaint and for Reargument on February 7, 2013 (Dkt. No. 32), and D&T opposed the motion on February 21, 2013 (Dkt. No. 34.) IPERS replied on February 26, 2013 (Dkt. No. 35), and filed a notice of supplemental authority on April 4, 2013 (Dkt. No. 36), to which D&T responded on April 5,

---

[2] "ESM" refers to various actions against Alexander Grant & Company, a public accounting partnership that prepared "inaccurate financial statements" upon which individuals, financial institutions, and government entities detrimentally relied. *See In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 354 (11th Cir. 1987).

2013 (Dkt. No. 37.)  On July 12, 2013 the Court held oral argument on IPERS' motion.  (Dkt. Nos. 38, 39.)

## II. Legal Standards

### A. Motion for Reconsideration

Motions for reconsideration are governed by Local Civil Rule 6.3.  "A motion for reconsideration is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *Drapkin v. Mafco Consol. Group, Inc.*, 818 F. Supp. 2d 678, 695 (S.D.N.Y. 2011) (quotations and citation omitted).  Accordingly, "[t]he threshold for prevailing on a motion for reconsideration is high." *Nakshin v. Holder*, 360 Fed. App'x 192, 193 (2d Cir. 2010); *see Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) ("The standard for granting such a motion is strict.").

"Generally, motions for reconsideration are not granted unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Cioce v. Cty. of Westchester*, 128 Fed. App'x 181, 185 (2d Cir. 2005) (quotations and citation omitted).  "[A] party may not advance new facts, issues, or arguments, not previously presented to the Court." *Polsby v. St. Martin's Press*, No. 97 Civ. 690 (MBM), 2000 WL 98057, at *1 (S.D.N.Y. Jan. 18, 2000) (quotations and citations omitted).  "Local Rule 6.3 is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court." *Dellefave v. Access Temporaries, Inc.*, No. 99 Civ. 6098 (RWS), 2001 WL 286771, at *1 (S.D.N.Y. Mar. 22, 2001).  "[C]ourts do not tolerate such efforts to obtain a second bite at the apple." *Goonan v. Fed. Reserve Bank of New York*, No. 12 Civ. 3859 (JPO), 2013 WL 1386933, at *2 (S.D.N.Y. Apr. 5, 2013) (citation omitted).

### B.     Motion for Leave to Amend

Federal Rule of Civil Procedure 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave . . . [and][t]he court should freely give leave when justice so requires."  A motion to amend may be denied due to "undue delay, bad faith, futility of the amendment [or] prejudice to the opposing party."  *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (citation omitted); *accord Berman v. Morgan Keegan & Co., Inc.*, No. 10 Civ. 5866 (PKC), 2011 WL 1002683, at *14 (S.D.N.Y. Mar. 14, 2011).

### III.    Discussion

The gravamen of IPERS' motion for reconsideration is that, although D&T's client was WGTC, D&T had a duty to audit the "interpartnership account" of WGTC and WGTI, which it defines as the flow of funds between the two entities.  This duty, triggered by so-called "red flags" indicating the organizations' "single entity" status, is unclear in scope, but reflects, at bottom, a duty to "go beyond what [D&T] did here."  (Tr. at 10:16-18.)  IPERS concedes that the duty of an auditor to investigate red flags that are not red flags of *fraud*, but rather, are one (or several) steps removed from any apparent, fraudulent activity,[3] and the way in which that duty can give rise to 10b-5 liability, is an "issue of first impression."  (*Id.* at 5:5-7.)  IPERS makes the point that despite case law that states that an auditor need only audit its client,[4] and has "no duty

---

[3] (*See id.* at 15:7-12 ("I think it interesting and telling and potentially dispositive that the plaintiff now says that the so-called red flags it alleged are not indications of fraud, they are indications of something else.  So as your Honor observed, we are one step removed from the more traditional case where somebody is trying to allege reckless conduct.").)

[4] *See, e.g.*, *In re Tremont Sec. Law, State Law and Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010) ("But most critically, the Auditors were never engaged to audit Madoff's businesses or to issue an opinion on the financial statements of BMIS. The Auditors' only role is

to audit further," it cannot "be the case that an auditor never has a duty to inquire further, regardless of the facts and circumstances." (Tr. at 5:16-17.) IPERS likens the relationship between WGTC and WGTI to that of conjoined twins, analogizing that D&T's decision to examine WGTC's books and records and issue a clean audit opinion, without examining the books and records of the interpartnership account of WGTC and WGTI, is tantamount to examining one conjoined twin and issuing a clean bill of health, despite the fact that the unexamined twin is riddled with cancer. (*Id*. at 11:12-16.) When pressed on the limits of its theory, however, IPERS conceded that there is not bright-line rule for when an auditor might be required to investigate beyond the books and records of its own client and delve into the accounting of related, non-client entities.[5]

---

that they audited the financial statements of the Rye Funds and the Market Neutral Fund. The notion that a firm hired to audit the financial statements of one client (the Rye Funds and the Market Neutral Fund) must conduct audit procedures on a third party that is not an audit client (BMIS) on whose financial statements the audit firm expresses no opinion has no basis. To impose liability on the Auditors would expand their limited, circumscribed duty impermissibly. Accordingly, plaintiffs' Section 10(b) claim against the Auditors is dismissed.").

[5] One of the colloquies between the Court and IPERS' counsel regarding the limits of its "conjoined twins" theory of liability proceeded as follows:

> THE COURT: I am concerned about this theory being presented sort of a slippery slope of auditors having to audit – there are often related entities, I think, when someone is conducting an audit and they only have to audit one entity. Where is the stopping point on this theory of liability that wouldn't require auditors generally to be subject to a duty to audit every related entity?
>
> MR. SHERIDAN: I am not sure I can answer where the outer limit is, Judge. But I can say that, it is our position that where, as we allege, it is obvious that the two entities are being conducted as one and the same, where they have common management, common ownership, where they are engaged in this commingling of assets, where they are sending out statements of accounts to each other's investor as if it is one big enterprise, where you have these facts,

The Court agrees with IPERS to the extent that its position is that an auditor may not, as a matter of right, simply ignore any and all related companies of its client, whatever the circumstances, issuing a clean opinion when it has no basis to do so.  However, presumably, in the most egregious of such circumstances, the books and records of an auditor's client would contain red flags of *fraud*, which, if ignored, would serve as a proxy for scienter, evincing recklessness.  *See, e.g.*, *In re Philip Serv. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 475 (S.D.N.Y. 2004) (finding auditor scienter where auditor ignored red flags, which, in the aggregate, were obvious indicators of fraud); *see also In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 385 (S.D.N.Y. 2007) ("Allegations of 'red flags,' when coupled with allegations of GAAP and GAAS violations, are sufficient to support a strong inference of scienter." (quotations and footnote omitted)).  Here, the Court's Opinion exhaustively considered the red flags alleged by IPERS, analyzing each indicator, and determined that the cited indicators evident from the books and records of WGTC were insufficient to put D&T on notice of fraud.  Accordingly, here, IPERS now asks the Court to consider an alternative theory:  that those indicators, while not evidence of fraud itself, reflected the close relationship between WGTC and WGTI, which, in turn, triggered a duty in D&T to examine the interpartnership account of the two entities before issuing a "clean" opinion.

---

> an auditor has a duty to go beyond just looking at the books and records of the one company.  If they don't do that and if they give a clean opinion, they are reckless.  In the words of the cases, it is tantamount to doing no audit at all.  It is like Siamese twins walk into a doctor's office and the doctor only examines one half of the Siamese twins and pronounces it healthy and the other side has cancer, that's reckless.  You have to examine the whole enterprise.

(*Id.* at 10:19-11:16.)

As noted, this novel theory of auditor scienter suffers from a boundaries problem, as it is unclear from IPERS' submissions which indicators would legitimately trigger an auditor's duty to examine non-client books and records.  Moreover, it is difficult to envision how an application of this "conjoined twins" approach to 10b-5 liability could ever remain distinct from the negligence theory of scienter that courts have repeatedly rejected as an appropriate proxy for the requisite state of mind in securities fraud cases. *See, e.g.*, *O'Brien v. Nat'l Property Analysts Partners*, 719 F. Supp. 222, 228 (S.D.N.Y.1989) ("[A] purported failure to investigate [does] not rise above the level of negligence, which is legally insufficient." (quotations, citations, and footnote omitted)).  Here, the Court is not prepared to extend 10b-5 liability to instances where an auditor fails to investigate certain red flags that, while themselves are not indicative of actual fraud, could, if pursued, lead to the discovery of fraud.  The Court agrees with D&T that the legal question of whether an auditor has a duty to inquire further into the books and records of a non-client is one couched in the "context of allegations of negligence or breach of duty of care," and, by contrast, "[r]ecklessness is a much higher standard." (Tr. at 18:4-12.)  Accordingly, the Court declines to reconsider its Opinion in light of IPERS' clarification of its legal theory in this case.

Next, IPERS argues that the Court overlooked its allegations that WGTC and WGTI were operated as a classic Ponzi scheme and failed to consider the similarity of this case to the ESM fraud described in the 11th Circuit's *In Re Alexander* opinion. The Court, however, explicitly noted and considered the Ponzi-scheme aspect of IPERS' allegations. *See, e.g.*, *Iowa Pub.*, 919 F. Supp. 2d at 326-27 ("[Greenwood and Walsh] managed to maintain the illusion of profitability by creating a 'classic Ponzi scheme.'" (citation omitted)); *id.* at 334 ("Second, IPERS argues that the structural characteristics of WGTC and WGTI constituted a 'classic Ponzi scheme,' which

9

D&T should have recognized." (citations omitted)); *id.* at 338 ("Even taking as true the allegations that this particular allocation evidences tax evasion, and was visible within WGTC's books and records, the question is not whether a competent auditor would have—and consequently, whether D&T should have—recognized the characterization as tax evasion. The relevant inquiry is instead whether this pleading is suggestive of recklessness on the part of D&T with respect to the fraud. At most, the misallocation of this performance fee, during a single relevant year, constitutes evidence of tax evasion, and does not necessarily support an inference that D & T consciously disregarded a Ponzi scheme of massive proportions."). Moreover, the "Ponzi-like" structure alleged by IPERS (*see, e.g.*, Plaintiff's Reply Brief, Dkt. No. 34 ("Pl.'s Rep."), at 5-6) ultimately reduces to the same fundamental theory addressed in the Opinion (and addressed above in a revised version): that D&T was reckless to ignore the indicators of structural abnormalities between WGTC and WGTI. As explained in detail in the Court's Opinion, while this structure was eventually revealed to be a complex and detailed Ponzi scheme, the indicators that D&T would have seen in its audit of its client are not those of fraud in the traditional sense, but rather, reflect irregularities—perhaps indicative of the entities' being operated as a "single entity" in many respects—into which a non-negligent or conscientious auditor should have inquired further.

      IPERS has also provided the Court with supplemental authority in the form of the Second Circuit's decision in *CFTC v. Walsh*, 712 F.3d 735 (2d Cir. 2013), which addressed the *pro rata* distribution of monies to various entities defrauded by Greenwood and Walsh's scheme. In *Walsh*, the court affirmed Judge Daniels' decision, which approved the Receiver's distribution plan, and in so doing, discussed details of the fraud. The Second Circuit, in particular, discussed the fact that WGTC and WGTI were operated as a "single entity," noting that the Receiver's

report had indicated a "long history" of commingled funds. *Id.* at 741 (citation omitted). The *Walsh* opinion also notes some of the facts that IPERS alleged in its original Complaint, and later highlighted in its motion for reconsideration, citing the Receiver's findings that (1) WGTC received funds from WGTI's investors; (2) WGTC made payments to or for WGTI's investors; (3) WGTC's investors received funds from WGTI; and, (4) WGTC's investors made payments to WGTI. *Id.* (citation omitted). The Second Circuit's decision, while certainly indicative of the depth, complexity, and far-reaching effects of Greenwood and Walsh's fraud, does not affect the legal sufficiency of the allegations in IPERS' Complaint. And while the *Walsh* opinion could conceivably bolster the plausibility of IPERS' underlying allegations of fraud, as D&T underscored at oral argument, "[t]he Second Circuit found no facts." (Tr. at 12:1-2.) The *Walsh* opinion does not render the allegation that D&T was reckless in failing to investigate WGTI or the interpartnership account any more plausible under the PSLRA's standards.

Finally, with respect to IPERS' request for leave to file an amended complaint, while the Court agrees with IPERS that its motion is procedurally proper, the Court denies its motion on the ground of futility. None of IPERS' proposed amendments to the Complaint support a plausible inference that D&T ignored red flags of *fraud*. Instead, the proposed amendments, where relevant, again at most reveal that WGTC and WGTI were related entities, which, under the conjoined-twins theory of liability, would require further inquiry on the part of the auditor. The Court, however, has determined that indicators of related-entity status are not, under traditional theories of auditor scienter, tantamount to red flags of fraud. For example, IPERS' amended Complaint includes allegations regarding common accounting personnel, alleging that D&T was aware that WGTC and WGTI shared the same employee who performed accounting processes and internal controls. (*See* Proposed Amended Complaint, Dkt. No. 32, Ex. 1

11

("PAC"), at ¶ 50(j)(i).)  Such an allegation, however, cannot reasonably be construed as clearly indicative of fraud.  The various transactions added to the Proposed Amended Complaint, which were "apparent from the books and records of WGTC" (PAC at ¶ 50(j)(ii)-(viii)), still suffer from the deficiencies discussed in the Court's prior Opinion, which noted that "auditor *access* is not tantamount to auditor awareness."  *Iowa Pub.*, 919 F. Supp. 2d at 332.  Moreover, even presuming that D&T was aware of the stated transactions and ignored them, the Proposed Amended Complaint fails to address how D&T was reckless in ignoring such indicators, when it was privy to only one side of the transaction:  the WGTC side, whose records, as those of the legitimate face of the Ponzi scheme, were purposefully kept "clean."  *Id.* at 338.  And finally, as for the allegations regarding the Summary of Investment Portfolio (PAC at ¶ 50(j)(x)), it is unclear how or why D&T would have had occasion to know that the Investment Portfolio, which was, importantly, prepared by non-client WCM and mailed to each investor, included misleading information taken from a shared office of WGTC and WGTI, which, in turn, supposedly indicated their single-entity status.  Accordingly, leave to amend is denied.

   The Court recognizes the seriousness of this fraud and its deleterious effect on unsuspecting investors such as IPERS.  Nevertheless, the PSLRA imposes a high burden on plaintiffs seeking to allege auditor recklessness based on purported red flag indicators of fraud.  Here, Plaintiff asks the Court to embrace a novel theory of liability based on an auditor's duty to investigate the single-entity status of two investment vehicles.  This theory is without clearly defined limits and is ultimately akin to negligence—requiring an inference that is at least one step removed from a traditional analysis of scienter.

   Accordingly, the Court declines to reconsider its earlier decision.

## IV. Conclusion

For the foregoing reasons, IPERS' motion for reconsideration and for leave to file an amended complaint is hereby DENIED.

The Clerk of Court is directed to close the motion entry at Dkt. No. 32.

SO ORDERED.

Dated: New York, New York
September 27, 2013

_____
J. PAUL OETKEN
United States District Judge